No. 35,088

MILLARD R. HODGSON, *Appellee*, v. THE MUTUAL BENEFIT HEALTH & ACCIDENT ASSOCIATION, *Appellant*.

(112 P. 2d 121)

512

Opinion filed April 12, 1941.

*Hall Smith, Frank P. Eresch* and *John M. Eresch,* all of Topeka, for the appellant.

*Oscar Raines, Ralph Glenn, Wendell B. Garlinghouse* and *Warren W. Shaw,* all of Topeka, for the appellee.

The opinion of the court was delivered by

HOCH, J.: This was an action to recover for permanent total disability under an accident and health insurance policy. Plaintiff prevailed, and defendant appeals.

Appellant contends that total disability was not shown, that appellee had not complied with certain conditions in the policy, and that recovery was precluded by a release signed by the appellee. As to any conditions not complied with, appellee's position was that they were either not binding or had been waived by the insurer.

Millard R. Hodgson, the appellee, was seriously injured on September 21, 1936, while working on the construction of the Topeka avenue bridge in Topeka. He was struck by a falling plank, fell approximately twenty-five feet, seriously injuring his foot, knee and one or more vertebrae. He was the holder of a policy issued by the appellant company which provided, among other benefits, for payment of $20 a month for a maximum of three months for partial disability, and $50 a month for total disability. The provision as to total disability is as follows:

"If such injuries as described in the insuring clause do not result in any of the above mentioned specific losses, but shall wholly and continuously disable the insured for one (1) day or more, and so long as the insured lives and suffers said total loss of time, the association will pay monthly indemnities at the rate of fifty ($50) dollars per month."

Following the accident Hodgson was taken to the hospital, where he remained for many weeks. During that period and also while he was confined to his home the insurance company paid him $50 a month. On February 22, 1937, when another monthly payment was due, an agent of the company called upon him and a lump-sum settlement was made. At that time the company paid him for the month then due, for an additional month at the $50 rate, and for three months at the rate of $20 which was provided for temporary disability, making a total payment on that date of $160. Thereupon Hodgson executed a receipt and release as follows:

"In consideration of a settlement in advance of the date due and other valuable considerations and the sum of one hundred sixty . . . no/100 dollars, to me in hand paid, the receipt of which is hereby acknowledged, I do for myself and beneficiary, hereby release and forever discharge the Mutual Benefit Health & Accident Association of Omaha, Nebraska, of and from any and all liability under its policy No. 50S-38246 for and on account of any loss or disability directly or indirectly to any accident, accidents, sickness or disability occurring or commencing on or about the 21st day of September, 1936."

Sometime later—apparently in 1939, though the record does not disclose the date—Hodgson brought an action on the policy in the Shawnee county district court alleging that as a result of the accident he was then and had been totally disabled, and asking recovery up to the time of filing the action at the rate of $50 a month with credit allowed for payments made. This action was dismissed without prejudice. Later, action was again brought and subsequently removed to the federal court. In this action judgment for $1,500 was asked in a first cause of action and in a second cause of action $17,340 to cover future payments based on petitioner's life expectancy. Upon motion of the petitioner the second cause of action was dismissed in the federal court on January 25, 1940, and the first cause of action was remanded to the district court of Shawnee county where issues were joined.

The answer denied generally the allegations of the petition and alleged that the insured had not complied with the terms of the policy in that he had not been attended by a physician at least once a week during the period for which total disability was claimed; that

he had not furnished "proof of claim" as provided for in the policy; that he had not suffered "total loss of time" as alleged in the petition, but in fact had worked at various gainful occupations during much of the time covered by the claim; that he had filed a claim against the bridge construction company under the workmen's compensation act and had received an award based on a finding by the commissioner of compensation for total disability for a period of twenty-two weeks, no appeal being taken from the commissioner's award; and that the insured had, for valuable consideration, signed a release fully discharging the company from any further obligation on the policy arising from the accident.

In addition to a general denial, appellee alleged in his reply that while he had attempted to engage in various occupations, he had found in each instance that he was physically unable to do so; that all conditions in the policy had been complied with and if any had not been complied with then compliance had been waived by the defendant company; that at the time the alleged release was executed, he, "the attending physicians, defendant, and defendant's agents were mistaken as to the extent and permanency of the plaintiff's injuries, in that they, and each of them, believed plaintiff had recovered from his injuries, and that he soon would be able to resume his work, when, in fact, and as it later developed, and was learned, plaintiff's injuries were of such a serious nature that he then was, now is, and will continue to be permanently totally disabled, and he is now suffering and will continue to suffer total loss of time as a result of said injury. That at the time of the making of the alleged release, the issuing and cashing of the draft and the execution of the rider, neither the plaintiff nor the defendant, nor defendant's agents knew or realized the seriousness and permanency of plaintiff's injuries and that, as a result thereof, the said instruments were executed under a mutual mistake of fact as to matters materially affecting the rights and status of the parties concerned"; and that said release was without adequate consideration and was void.

Trial was had before a jury which found for the plaintiff in the sum of $1,840. The jury also answered special questions as follows:

"1. Did the plaintiff, Millard Hodgson, engage in the insurance business as a salesman after September 21, 1936? A. Yes, he assisted in the sale of three policies and made three other unsolicited sales.

"2. If you answer the preceding question in the affirmative, then state about when and for how long a period of time. A. For about three weeks just preceding March 19, 1937.

"3. Did the plaintiff, Millard Hodgson, purchase, manage and operate a grocery store in Topeka, Kansas, after September 21, 1936? A. Yes, he did purchase a grocery store but was physically unable to successfully manage and operate it.

"4. If you answer the preceding question in the affirmative, then state for how long he managed and operated said grocery store. A. May 15 to August 10, 1937.

"5. Did the plaintiff, Millard Hodgson, enroll and attend Strickler's Topeka Business College? A. Yes.

"6. If you answer the preceding question in the affirmative, then state during what period of time he did attend said school. A. Regularly, September, 1937, to February, 1938, and irregularly, February, 1938, to July, 1938.

"7. Did the plaintiff, Millard Hodgson, work as night watchman and clerk for Paul Petty after September 21, 1936, in his grocery store? A. He was employed by Paul Petty after September 21, 1936, but was physically unable to perform duties of watchman and clerk.

"8. If you answer the preceding question in the affirmative, then state for how long a period of time plaintiff so worked. A. Three weeks.

"9. If you find that plaintiff worked for Paul Petty, what compensation did he receive, if any? A. $10 per week, total $30.

"10. Did the plaintiff, Millard Hodgson, work for Peterson's Market as a night watchman and clerk after September 21, 1936? A. He was employed by Peterson's Market after 9/21/36 but was physically unable to perform duties of night watchman and clerk.

"11. If you answer the preceding question in the affirmative, then state for how long he did work as such night watchman. A. Two weeks.

"12. If you find that Millard Hodgson worked for Peterson's Market, what compensation did he receive, if any? A. $10 per week, total $20.

"13. Was the plaintiff, Millard Hodgson, after February 22, 1937, under the regular care and attendance of a licensed physician or surgeon at least once a week? A. No. Evidence shows this would have been futile.

"15. Has the plaintiff, Millard Hodgson, suffered a total loss of time since February 22, 1937? A. Yes.

"16. Did the plaintiff, Millard Hodgson, receive any benefits under his insurance policy after February 22, 1937? A. $10.83 for influenza.

"17. Did the plaintiff, Millard Hodgson, file with the defendant any proof of loss or claims for total loss of time for the period from February 22, 1937, to date? A. No.

"19. If you find that plaintiff did not furnish defendant proofs of loss as required by clause 7 of standard provisions of the policy, then state: (a) whether defendant waived such furnishing of proof of loss; A. Yes. (b) what acts of defendant do you find constituted such waiver? A. (1) Defendant's agent, Mr. Davis, in conversation with Mr. Hodgson at the latter's home about January, 1939, stated in effect that defendant company had discharged its obligation under policy and that no further obligation existed as a result of accident occurring 9/21/36. (2) Admission of attorney Smith, in reference to previous suit, that the defendant had denied any liability at that time.

"20. Was the plaintiff disabled from performing one or more important duties after February 22, 1937? A. Yes.

"21. If your answer to the preceding question is in the affirmative, then state what one or more important duties he was unable to perform by reason of his disability. A. Unable to lift heavy objects, remain on feet any length of time, climb or descend stairs with any degree of ease."

We first consider appellant's contention that on the answers of the jury appellee was not totally disabled, had not suffered a "total loss of time" and that appellant was therefore entitled to a judgment notwithstanding the general verdict, and notwithstanding the answer "yes" to question 15.

While the jury found that appellee attempted to carry on in various lines of work, he found himself unable, in each instance, to continue to do so. (Answers 1 to 12.) The rule is well established that "total disability" within the meaning of insurance policies does not necessarily mean utter helplessness, nor inability to perform any task, or even in some cases, usual tasks for a limited period. (29 Am. Jur. 872, § 1161; 1 C. J. 466; 42 Words and Phrases, pp. 25-34.) To hold otherwise would be to penalize every effort of an injured or sick person to rehabilitate himself and thus incidentally relieve the insurance carrier. This question was dealt with by the United States Supreme Court in the very recent case of *Berry v. United States* (opinion filed March 3, 1941). The insured, under a war risk insurance policy, had been given vocational training in photography and also in auto repair work, but there was evidence that his efforts to continue in those lines were unsuccessful on account of his physical handicaps. He tried farming, operating a garage, selling cooking utensils and perhaps other employments, but always with like result. In holding that these various employments carried on for certain temporary periods but without ability to continue in them did not preclude recovery for "total disability," the court said:

"It was not necessary that petitioner be bedridden, wholly helpless, or that he should abandon every possible effort to work in order for the jury to find that he was totally and permanently disabled. It cannot be doubted that if petitioner had refrained from trying to do any work at all, and the same evidence of physical impairment which appears in this record had been offered, a jury could have properly found him totally and permanently disabled. And the jury could have found that his efforts to work, all of which sooner or later resulted in failure, were made not because of his ability to work, but because of his unwillingness to live a life of idleness, even though totally and permanently disabled within the meaning of his policies."

Appellant contends that our recent decision in *Fricke v. Mut. Life Ins. Co.*, 152 Kan. 525, 106 P. 2d 677, is controlling, as against recovery, on the facts in the instant case. We cannot agree. The case

is clearly distinguishable. While the insured in that case was perhaps unable to perform the manual labor on the farm that he could perform prior to his accident, he was able to continue and did continue in the active management of his large farming operations. The court said: "There is an abundance of evidence that he managed, supervised and directed the operation of his farms and attended to all the business in connection therewith, and that this was a substantial business, successfully managed and conducted. The jury so found in answer to special questions 3, 4, 5 and 7." (p. 529.) In the instant case the jury found that the insured attempted again and again to engage in gainful employment, but in each case had to quit, and was in fact totally disabled. There was ample evidence to support such finding.

It is next contended that by failure to have the attendance of a physician at least once a week during the whole period in question appellee was precluded by the terms of the policy from recovery for total disability. The pertinent provision of the policy is as follows:

"(a) This policy does not cover death, disability, or other loss sustained in any part of the world except the United States and Canada, or while engaged in military or naval service in time of war, or any act of war, or while the insured is not continuously under the professional care and regular attendance, at least once a week, beginning with the first treatment, of a licensed physician or surgeon, other than himself."

In appropriate instructions the trial court called attention to this provision of the policy, but the jury was also instructed that in order to recover the plaintiff would not be required to comply with that provision if he were in fact totally and permanently disabled, and if no benefit would be received by such weekly attendance of a physician, and such attendance would therefore be futile. In answer to a special question, the jury found that the weekly attendance of a physician would have been futile. (Question 13.)

While there is some conflict of authority on the question, we think, after careful research, that the great weight of authority supports the rule stated in the instructions by the trial court. In the first place, it is generally held that where a policy provides benefits for both temporary and permanent disability, and has a provision requiring regular attendance of a physician, the provision relates only to temporary disability. (7 Couch on Insurance 5797, § 1679; 1 C. J. 466, § 173; 29 Am. Jur. 885.) That is a reasonable interpretation and to hold otherwise would lead in many cases to results so mani-

festly unreasonable that courts would not in good conscience enforce the requirement. Suppose a policyholder is totally and permanently disabled through the loss of sight in both eyes—would any court re-. quire the weekly attendance of a physician in order to secure continuing benefits provided by the policy? Obviously not, and such situations are commented upon in many decisions. (115 A. L. R. pp. 1066-1067; *Natl. Life Ins. Co. v. Patrick*, 28 Ohio App. 267, 162 N. E. 680; *Hunter v. Federal Casualty Co.*, 199 App. Div. 223, 191 N. Y. S. 474.)

Appellant calls attention to 1 C. J. 466, § 173, and to the case of *Provident Life & Accident Ins. Co. v. Harris*, 234 Ky. 358, 28 S. W. 2d 40, wherein occurs the same citation from Corpus Juris. But it will be noted that the rule cited in Corpus Juris specifically states that the provision for attendance of a physician—where benefits for both temporary and permanent disability are provided—"refers only to cases of temporary total disability." In *Liston v. New York Casualty Co.*, 28 Misc. Rep. 240, 58 N. Y. S. 1090, cited by appellant, the policy provided "no disability shall constitute a claim . . . where the claimant is able to leave his bed or house . . . nor when the attendance of a physician is not required every second day at the bedside." The policy in that case apparently provided no benefits except while the insured was confined to his bed or house, which is very different from the instant provision.

Analogous to the Liston case, *supra*, is our own case of *Sheets v. Life Insurance Co.*, 116 Kan. 356, 225 Pac. 929, cited and stressed by appellant. In that case the policy provided benefits in two classes of cases—one for total disability while the insured was "necessarily and continuously confined within the house" and the other while he was not so confined. The claimant was not permitted to recover during the period when he was not confined to the home, but was making visits to the physician. The two classes of cases were established to measure, however roughly, the degree of sickness. A wholly different situation is presented where the continuing attendance of a physician would in no way measure the degree of sickness, or incapacity of the insured. The same comment may be made concerning *Richardson v. Interstate Business Men's Accident Ass'n*, 124 Kan. 685, 261 Pac. 565, cited by appellant and which specifically followed the Sheets case, *supra*. While the policy in that case did contain a provision relative to the attendance of a physician, in addition to the requirement of confinement in the house, the case

was decided soley on the latter provision, the court saying: "In the case at bar nothing whatever is said in this part of the contract about disability, the only question being whether or not the insured was confined to the house. We think he was not. Of course, there are other features in this provision, such as being under the constant treatment of a regular physician and the confinement being the result of the disease, but these points are not here controverted. We adhere to and follow the decision in the Sheets case." (p. 688.) Further analysis of cases cited would unduly prolong this opinion.

On the question of fact, appellant contends there was no evidence to support the jury's finding that the regular weekly attendance of a physician would be futile. We cannot agree. While Doctor Pusitz testified that the claimant "could have the joint stiffened" and "would very likely get a foot he could at least walk on much better than he can at this time," the injury to the foot was by no means the only serious injuries suffered by the appellee, and in answer to a direct question as to whether, in his opinion, the appellee "would have benefited during the past year had he been attended weekly by a physician and surgeon," Doctor Pusitz replied: "I don't think so." Moreover, on cross-examination by appellant the appellee testified that he consulted Doctors Loveland, Mills and Clark and was told that there wasn't anything they could do for him.

Appellant next contends that appellee cannot recover because he failed to make the "proof of loss" required by the terms of the policy, and that the jury's answer to question 19, *supra*, that such proof had been waived by appellant is contrary to the evidence. The jury answered (question 17, *supra*) that the appellee did not file with the company any proof of loss or claims for total loss of time for the period beginning February 22, 1937. This answer stands as the finding on that question, although the trial court, in the course of extended comment when overruling various post-verdict motions, stated: "I consider that proofs of loss were furnished." The court may have had reference to the notice of the accident, the claim and the proofs of loss which were furnished prior to February 22, 1937. Certainly the company, having made payments up to that time, is in no position to question the adequacy and regularity of the proofs theretofore furnished. We incline to the view that such prior proofs do not take the place of proof of total permanent disability subsequent to the settlement. It may be said, however, that the policy is not entirely clear as to when proof of loss based on permanent total

disability should be furnished. Clause 7 provides that "affirmative proof of loss must be furnished . . . in case of claim for loss of time from disability within ninety days *after the termination of the period for which the association is liable*" (italics ours). Obviously, if a disability can be shown to be actually "permanent" the "period for which the association is liable" terminates only with death. Presumably, the provision is intended to mean that proof should be furnished within ninety days after each monthly period for which the insurer is liable. Be that as it may, the court instructed the jury that if they found that prior to the commencement of the present action the company, with knowledge of the claim, declined to pay it, and by clear and decisive acts led the plaintiff to believe its refusal was not based on failure to furnish proof of loss, then the company would be said to have waived the furnishing of such proof of loss. In its answer to question 19, *supra*, the jury found that there had been such a waiver. (See 7 Cooley's Briefs on Insurance, p. 6062, [c].)

On the question of waiver, appellant contends at the outset that it was not within the issues raised by the pleadings, and therefore cannot be reached as an issue of fact. The argument is that the answer specifically denied that any "proof of claim" showing permanent disability had been furnished; that the reply simply alleged generally that all conditions of the policy had been performed and that if any conditions had not been performed, their performance had been waived; and that this allegation of waiver was a mere conclusion of law, no facts constituting waiver being pleaded in the reply. Appellant, however, did not attack the reply by demurrer, by motion to strike, or motion to make definite and certain, and, as far as the record discloses, the contention that the issue of waiver was outside the pleadings was first specifically raised on this appeal. It is too late to raise it now.

After attempting without success to engage in various employments, the appellee, by his attorney, wrote to appellant in the latter part of 1938 advising it of his physical condition and claim of total disability. The "forms" upon which proof of loss may be made were not forwarded, but instead, an agent of the appellant called upon appellee. The jury found that in the conversation which then took place the agent stated that the company had discharged its obligation and that no further obligation existed as a result of the accident. The jury also found that appellant's attorney, in a pre-

vious suit, had admitted this denial of liability. Appellant argues that since the alleged denial of liability was made during the pendency of a former action, subsequently dismissed, it is not available as a waiver in this action. The argument is not persuasive. The essential and substantial question is whether the appellant was in fact denying all liability on the policy on other grounds and thereby rendering the formal proof of loss by the insured a fruitless performance. (7 Couch on Insurance, 5545, § 1573.) Certainly an admission in court by appellant's attorney that such denial of liability had been made is as binding on appellant as would be a statement to the same effect made anywhere else by a responsible agent of the company. There is ample evidence to support a finding that any further liability was denied.

Appellant does not show that at any time prior to the filing of the answer in this action it based its denial of liability upon failure to furnish proofs of loss, or that its rights have been prejudiced by failure to furnish them. On the contrary, the record indicates that from the start denial of liability was entirely on other grounds. The trial court stated it thought there was sufficient evidence to support the jury's findings of waiver. We agree with that conclusion and find no error in the refusal to set aside the answer to question 19. (7 Cooley's Briefs on Insurance, p. 6019 *et seq.; Insurance Co. v. Weeks,* 45 Kan. 751, 26 Pac. 410; *Bank v. Colton,* 102 Kan. 365, 170 Pac. 992; *Jones v. Brotherhood of L. Firemen,* 141 Kan. 403, 406, 41 P. 2d 774.)

The execution of the release by appellee on February 22, 1937, is admitted. The trial court instructed the jury that this release constituted a complete defense to plaintiff's case unless they found, from a preponderance of the evidence, that the release was signed under a mutual mistake of facts as to the then present physical condition of the plaintiff. In further instructions the court then instructed the jury as to what constitutes such mutual mistake of fact as to avoid the release. We need not here enter upon any extended analysis of the decisions or discussion as to what constitutes such mistake of fact as will permit avoidance of a release of claim for personal injuries. Textbook statements of the general rule are difficult to harmonize, and there is marked conflict in the cited cases. There is general agreement, however, that the mistake must be as to a present, existing fact or condition and not a mere mistake in prophecy as to a future condition. (48 A. L. R., pp. 1467-1475;

*Crouch v. Missouri Pac. Rld. Co.,* 128 Kan. 26, 30, 31, 276 Pac. 81.) The trial court so instructed the jury, and no objection was made to the instruction. We think there was sufficient evidence to support a finding, which, under, the instructions as given, is implicit in the general verdict, that appellant and appellee were mutually mistaken, at the time the release was signed, as to the essential nature of the injuries, the inherently serious character and permanency of the appellee's then physical condition resulting from the accident, and to justify the post-verdict comment of the trial court that "the injury that this man received was undoubtedly, to my mind, more than anyone ever realized. In this fall one of the vertebrae—lumbar vertebra—was, you might say, squashed; it was mashed down perpendicularly and spread out horizontally, markedly so in an X-ray picture. He received an injury to one of his knees and to one of his feet. . . . There isn't any question in the world but that there was a mistake on the part of both parties as to this man's condition at the time this release was signed."

Other contentions of appellant are largely incidental to those already considered and do not require further attention.

We find no error. The judgment is affirmed.