SEAMAN, APPELLANT, *v.* NEW YORK LIFE INSURANCE CO., RESPONDENT.

(No. 8,182.)

(Submitted May 26, 1941. Decided July 9, 1941.)

[115 Pac. (2d) 1005.]

330

*Mr. Alfred F. Dougherty, Mr. H. L. Maury* and *Mr. A. G. Shone,* for Appellant, submitted a brief; *Mr. Dougherty* and *Mr. Shone* argued the cause orally.

*Mr. J. A. Poore* and *Mr. J. A. Poore, Jr.,* for Respondent, submitted a brief; the latter argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This is an action brought to recover disability benefits under a policy of insurance written by the defendant company on the life of the plaintiff and which provides for the payment of total and permanent disability benefits, the provision therefor in the policy being as follows:

"Disability shall be considered total whenever the Insured is so disabled by bodily injury or disease that he is wholly prevented from performing any work, from following any occupation, or from engaging in any business for remuneration or profit.

"Upon receipt at the Company's Home Office * * * of due proof that the Insured is totally disabled as above defined and will be continuously so totally disabled for life, or if the proof submitted is not conclusive as to the permanency of such disability, but establishes that the Insured is, and for a period of not less than three consecutive months immediately preceding receipt of proof has been, totally disabled as above defined," the prescribed benefits will be granted.

"Before making any income payment or waiving any premium, the Company may demand due proof of the continuance of total disability, but such proof shall not be required oftener than once a year after such disability has continued for two full years. Upon failure to furnish such proof, or if the Insured performs any work, or follows any occupation, or engages in any business for remuneration or profit, no further income payments shall be made or premiums waived."

The complaint alleges that the plaintiff became totally disabled by a recurrent double hernia on January 28, 1939, and thereafter in June, 1939, made report of his condition to the insurance company and made claim for disability benefits for the period following the injury; that the claim was allowed and income payments were made by the company and premium payments waived for the period covered, and thereafter until November, 1939, when the company refused to make further payments on the ground that the insured was no longer totally disabled.

The action brought is for the recovery of benefits accruing from October 28, 1939, to February 28, 1940, amounting to $195.68, and also for the refund of $119.35 premium paid by the insured and which he claims should have been waived under the terms of the policy. The allegation in the complaint as to the condition of disability is that "the plaintiff, then 36

years of age, became wholly, totally, continuously and permanently disabled by recurrent double hernia so that he was then prevented thereby from performing any work, from following any occupation, or from engaging in any business for remuneration or profit and, as provided by said policy, so notified the defendant; that ever since said time he has continued to be and still is so wholly, totally, continuously and permanently disabled by recurrent double hernia so that he has ever since been and still is thereby prevented from performing any work, from following any occupation, or from engaging in any business for remuneration or profit.''

The defendant's answer admits the allegations of the complaint except as to the condition of total, permanent disability of the plaintiff and its liability to pay the benefits claimed and the premium refund demanded, all of which is denied. The answer alleges as a separate defense that the hernia with which plaintiff is afflicted can be cured and he can be restored to his normal physical strength by a surgical operation, such as an ordinarily prudent man would undergo, and that plaintiff has been so advised by competent surgeons, but has declined and refused to have such operation performed.

The case was tried to the court without a jury. The court found for the defendant and entered judgment accordingly from which the plaintiff has appealed.

There is no conflict in the testimony and other evidence submitted. Yet it is necessary to review the whole evidence in some detail to find the basis for a conclusion. The affliction which is the cause of plaintiff's disability is a recurrent condition reaching back over a period of eleven years with varying efforts at rehabilitation and amelioration. All those things need to be taken into account in determining whether the plaintiff now has a just cause, especially in view of the contention that the condition could be remedied by operative repair.

The policy was issued and delivered to the appellant, effective as of the 16th day of February, 1928, in the face amount of $4,892 life insurance, and for the payment to the insured of a monthly income of $10 per thousand of the face of the policy

for each completed month from the commencement of and during the period of continuous, total disability of the insured as defined in the policy, with premium ·payments to be waived during any such period of disability. The annual premium is $119.35. The policy has been kept in good standing.

The insured first suffered an injury in December, 1929, in straining himself changing a tire on a car, when he was ruptured resulting in a double hernia. He discovered the rupture several days later when he noticed two lumps right above his legs and below the stomach on both sides. He consulted Dr. Monahan and was advised to procure and wear a double truss, which he did. He attempted to continue his work at the Postal Telegraph, where he was then employed, but could not continue at the work. The binding of the truss upon the hernia was so painful that he could not wear it. Upon further consultation with Dr. Monahan, an operation was decided upon, which he had. This was in December, 1929. He was in the hospital after the operation for several weeks and after that he remained off his feet most of the time for a period of four months. The insurance company paid his disability claims for several months following this injury.

About five months after this first injury, plaintiff went to work in a store where he worked for a year and a half. Since then he was employed at various jobs. In 1934, when he was employed as common laborer on a government project, he was again ruptured in lifting a rock. Upon consulting Dr. Monahan he was told that he had a recurrent hernia on the right side. He was told to be very careful and not do any work of any kind. For five months he did not do any work, and the lump on the right side practically disappeared. Dr. Monahan advised that he wear a truss, which he tried, but without any success. He said: "It just binded so hard and fast. The steel about the truss was so tight that it kept like someone punching me in the groin all the time. I tried wearing it over my underwear and under my underwear with no success at all. So I took the truss off, and didn't wear it since then at all. I had felt all right from that time up until January. I think it was January 26th,

1939, when I was teaching telegraphy school at the court house in Butte. After class, I attempted to put my instruments away in the storeroom in the basement of the court house, and in going down the stairway I slipped and fell all the way down the stairway. I felt a very sharp pain on both sides.'' He again saw Dr. Monahan and was told he had a recurrent right hernia and that the intestines were hanging out of the socket. The doctor advised discontinuing work entirely, which he did. He was then employed on a WPA project and had to make report of his condition to the project manager. Upon advice of the project manager he saw Dr. MacPherson, the government doctor, who made an examination and found that there was a rupture on the right side and he suggested wearing a truss. It developed that there was again a double hernia. The government doctor prescribed a single truss nevertheless, which was made for him and which he attempted to wear, but which did not work out satisfactorily. This was in March, 1939. He could not wear the truss and has not worn it since. He has not done any work since that time. For a period of about eight months, the full school year of 1939–40, he attended the Montana State University Law School.

As to the nature of the injury and the effect of it upon the physical condition of the plaintiff, the plaintiff testified as follows:

''Q. You have referred to your injury as hernia. For the purpose of the record, will you place definitely the location of the injury on your body? A. The injury was right practically directly over my testicles on the right side and on the left side, about an inch above my legs and directly underneath my stomach.

''Q. Was your injury painful? A. Yes, very painful. During my time at the Montana University here, I could not sit down for any length of time and do my work in the school. I had to take my books and my work home, where I could lie down on my back, in order to receive relief. Sometimes I would have head-aches and indigestion and sharp pains, and the

only relief I could get was lying on my back and kicking my feet up over my head to get the intestines back in position.''

And on cross-examination:

''Q. You go around, walk around and go where you please? A. Yes sir.

''Q. Make trips to Butte? A. I get rides to Butte.

''Q. You make trips to Butte? When you go to Butte, you walk around and go where you please? · And you do the same here in Missoula? A. I do that with pain. Extreme pain at times, when the pain is so sharp that I can't stand it any longer, I find a place to park. I sit down there until the pain has gone away to some degree that I can continue.''

Dr. Randall, who in February, 1940, at the request of defendant company examined the plaintiff, said he had a hernia on the right side that would admit about two fingers and on the left side one finger. He stated that in his opinion the plaintiff then could do work which did not involve heavy lifting; that he might get strangulation at any time; that he might stumble on the sidewalk and get strangulation. Explaining strangulation he said: ''It is a loop of the intestine that has gone down through the opening, the inguinal ring, and it slides through and then it is hard to return. The ring more or less contracts, and the intestine expands, and it cuts off the circulation, and then we have strangulation.'' As to his opinion on the proper method of treatment of the case, Dr. Randall said he would advise an operation; that there was always some risk of failure of an operation, but that the percentage of recovery in hernia operations runs very high, about 97%; that a cure as result of operation was not certain.

Dr. Hall, of the medical staff of the Northern Pacific Railway Hospital at Missoula, testified concerning an examination he had made of the plaintiff the day before the trial, and in explaining the result of the examination, the doctor testified as follows:

''A. On examination I find that he has a linear scar over the lower abdomen on both sides. The scar on the left being higher, relatively, than the one on the right. On examining the inguinal

ring, you can introduce your two fingers in the external inguinal ring, and ask him to cough, you get a protrusion of the bowel through this ring. On the left side the ring, while lax, only admits one finger with a little play, and there on coughing there is no protrusion. My impression or diagnosis, if I am to give that, is a hernia, a recurrent hernia, inguinal, indirect, or I would say, direct-indirect hernia of the right side.

"Q. You say a direct-indirect hernia on the right side. Will you explain what a direct-indirect hernia is? A. We think of an indirect hernia as one that comes down through the tunnel in which the spermatic cord to the testicle passes. A direct hernia is due to the laxity of the muscles medial to the indirect, and does not come through necessarily, through this tunnel.

"Q. Am I to understand that a direct hernia, rather than following the spermatic cord, protrudes directly through the abdomen? A. Yes.

"Q. Does the fact that it is a direct-indirect add to the risk of the operation? A. I don't think it adds to the risk. It adds to the possibility of more recurrence. It carries a greater recurrence to it than the indirect.

"Q. It adds more to the recurrence? A. Yes.

"Q. As a doctor in the Northern Pacific Hospital, do you have to pass applicants for positions on the Northern Pacific Railway? A. Yes.

"Q. You pass upon applicants for the position of railroad telegraphers? A. All work in connection with the railroad, all departments.

"Q. Assume a man 36 years of age applying for the position of railroad telegrapher with your company. Assume further that he has a direct-indirect inguinal recurrent hernia, and assume that he has applied for a position of railroad telegrapher with your company, and he has come into your office for an examination to be passed. Would you pass such an applicant? A. No, he would be unacceptable. We would turn him down without further examination."

Upon this evidence the trial court found that at no time since February, 1939, has the plaintiff been totally or permanently

disabled and that he has not by reason of any disability during any of that period been wholly prevented from performing any work or following any occupation or from engaging in any business for remuneration or profit. This conclusion by the trial court is not supported by the evidence. There is no dispute as to the facts. The plaintiff is afflicted with a recurrent double hernia. That is proved by the plaintiff's own testimony and the testimony of the doctors; also it is admitted by the defendant.

As to the seriousness of the affliction and its effect on the physical condition of the plaintiff: There is the fact that the affliction is one of long standing, first occurring in 1929, relieved by operative repair, thereafter recurring, responding favorably to treatment and long rest, and again recurring, a condition continuing over the period of about eleven years. This is proved by the testimony of the plaintiff and corroborated by doctors' testimony, and no evidence was offered by the defense in rebuttal thereof. During that period of time the plaintiff was employed intermittently at various occupations—telegraph operator, various kinds of manual labor in some of which heavy lifting was involved, instructor in telegraphy and instructor in boxing in government project school. There were recurrent ruptures with periods of total incapacity for any physical exertion. The condition can be seen to have been almost a constant impediment and deterrent to any effort and especially to physical exertion. The plaintiff testified that it was.

There was a recurring rupture on both sides of the abdomen on January 29, 1939, from which there has been no recovery. This is proven by the testimony of the plaintiff and also the testimony of Dr. MacPherson, Dr. Randall and Dr. Hall, and is admitted by the defendant. The plaintiff says he cannot do any work. He says he is able to walk around but with more or less discomfort always, and at times severe pain. During the eight-month period, from October, 1939, to June, 1940, he attended the Montana University Law School as full time student. His own description of his condition during that time shows that it was with extreme difficulty that he attended lectures and

carried on the course of study. Dr. Hall, who examined him the day before the trial, described his condition as more than ordinarily serious. He said that in the type of hernia with which the plaintiff is afflicted, direct-indirect hernia, there is greater possibility of recurrence than in a case of direct hernia. He said that one in plaintiff's condition would not be accepted for employment as telegraph operator by the Northern Pacific Railway Company.

These are the only facts before us as to his actual condition. Dr. Randall and Dr. MacPherson said in their opinion that plaintiff is able to do work that does not involve lifting. This was their opinion as experts. But they said also that there was the constant danger of strangulation, a more serious condition.

.Respondent contends that the fact that the appellant attended law school and carried a full course of study for eight months is strong evidence of his ability to engage in remunerative occupation. We do not find anything in the evidence relating to his attendance of law school that gives support to that contention. At law school the necessary physical exertion was reduced to a low minimum. Periods of constant attendance upon any matter were of short duration, with longer rest periods, as the daily program, and with the right at all times to adjust his application of effort in carrying out the program so as to relieve strain and exhaustion and pain. His status as a law student was entirely different from what it would be were he engaged as an employee for hire. Any employment that would be gainful and afford the means of livelihood would require regular attendance and application to duty, with a full day's work each day. He was then a man thirty-six years old and his education and training and experience were such as qualified him only for occupations in which there was more or less physical effort required.

As to his ability to make a living other than by work in the employ of others, that is not in the case. He had no business of his own. Always he had earned a living by working for others, except as he may have made some money at prize-fighting which he said he had indulged himself in some during his younger

years. There is no evidence that he has capital to invest in business and the facts as to his circumstances, as disclosed by the record, show that he had no money.

The proof here clearly and conclusively makes out a case ▆ of total disability under the terms of the policy. ''The rule is well established that 'total disability' within the meaning of insurance policies does not necessarily mean utter helplessness, nor inability to perform any task, or even in some cases, usual tasks for a limited period. \* \* \* To hold otherwise would be to penalize every effort of an injured or sick person to rehabilitate himself and thus incidentally relieve the insurance carrier.'' (*Hodgson* v. *Mutual Benefit etc. Ass'n,* 153 Kan. 511, 112 Pac. (2d) 121, 125. And see *Berry* v. *United States,* 61 Sup. Ct. 637, 85 L. Ed. 945; and 29 Am. Jur. 872, sec. 1161; and 1 C. J. 446.)

As to the possibility of a cure by operation, that cannot be ▆▆ considered as a defense under the terms of the policy and the facts and circumstances as here shown. The policy makes no provision for operative repair or treatment of any kind and does not require the insured to first have medical care or treatment in an attempt at a cure before receiving the disability benefits. (*Pacific Mutual Life Ins. Co.* v. *Matz,* 102 Colo. 587, 81 Pac. (2d) 775.) And there is nothing to show lack of good faith on the part of the insured in not having an operation. He did have an operation after his first rupture in 1929. After the second rupture five years later he had no operation but stayed off his feet and rested for several months which brought favorable results and apparently effected a cure. With the strong possibility always of the condition recurring, the insured might well feel now after the third rupture that the better course would be to take care of himself and refrain from labor of any kind for a longer period of time before again resorting to an operation.

The insured testified that after the experience of the first operation he was very much afraid, also, he had an operation (not for hernia) about two years ago when the wound did not heal for about three months. The doctor told him his blood was

in poor condition and would not coagulate and advised him against having any further operation of any kind. The doctor who performed the operation was dead at the time of the trial.

Hernia is not the simple, easily curable affliction it may appear to be from the large percentage of recovery as the result of operation which the doctors speak of. Generally, the disorder is due to a weak condition of the abdominal wall, and also there may be a condition of congenital malformation. More often the difficulty is more deep-seated than just a rupture of the wall resulting from strain or puncture by some external force. And in case of rupture from strain it generally occurs because of the weak structural condition already existing and of which the subject may have no knowledge. Operative repair may relieve the aggravated condition but always with the possibility of the aggravated condition recurring. And operative treatment is not always successful and may result in the death of the patient. The doctors who testified said a herniotomy is always considered a major operation and always attended with some danger. In a text written by Dr. Roscoe N. Gray, Surgical Director of the Aetna Life Insurance Company and the Aetna Casualty and Surety Company—Attorneys' Text Book of Medicine—the author in the preface to the work, speaking of reports of results in treatment of the sick, says: "Great clinics and hospitals throughout the world have published their results, but they deal with unusual cases treated by unusual means by doctors of unusual ability. Little is known in regard to disability and medical cost under average surgical administration." On page 782 of this text the author, speaking of hernia operations, says: "Many doctors consider a hernia to be a condition of no importance. They point out that patients are only disabled a matter of about six weeks, with say in the neighborhood of $125 to $175 medical expense. They feel that any doctor is well qualified to operate upon a hernia, if he has had any surgical experience whatever. In fact, hernia operations, probably more than any other, seem desirable work upon the part of surgeons of little experience. However, they do not realize the gravity of herniotomy. In Northern California we

have approximately forty hernias per year, two-thirds of which come to operation, or about twenty-six per year. During five years this would be approximately 130 operations. In such a group, we had two fatalities and one life pension, or an exceedingly grave result in about two per cent of all cases operated. Such a record is not duplicated even with fracture of the femur. Taking an average of 130 fractures of this bone, one would not expect to have two of them die, and one develop into a life pension involving about $8,000 in medical cost. Nevertheless, this is the record for hernia, indicating that such cases should only be operated by well qualified surgeons, who make sure their patients are safe operative risks.'' The same authority, speaking further of the difficulty in treating hernia cases, says that the wearing of a truss is attended with some danger. ''Strangulation may occur when a truss is worn, because the pressure produced by the truss irritates the tissues about the opening in the abdominal wall. Irritation leads to swelling of the wall structures, increasing the chance that the opening may become too small, resulting in strangulation.''

While operative repair is generally advisable and generally safe in the hands of a competent surgeon, and may be advisable in this case, nevertheless, in the absence of any provision in the policy requiring that it be done, it certainly should be left to the insured to determine whether or not to have an operation, and especially in view of the long history of the case and the experience the insured has had in seeking relief and trying to overcome the affliction. Certainly it cannot be concluded from the record that the appellant has unreasonably failed to seek remedy for his disability.

It is ordered that the judgment in favor of defendant be reversed and that judgment be entered in plaintiff's favor as prayed for in the complaint.

Mr. Chief Justice Johnson and Associate Justices Angstman, Erickson and Morris concur.