MARTIN NELSON, Plaintiff and Respondent, v. COMBINED INSURANCE COMPANY OF AMERICA, an Illinois Insurance Company, Defendant and Appellant.

No. 11692.
Submitted February 10, 1970.
Decided April 2, 1970.
Rehearing Denied May 6, 1970.
467 P.2d 707.

Herron & Reber, Clayton Herron, Joseph E. Reber, Jr. (argued), Helena, for defendant and appellant.

Kelly & Secrest, William T. Kelly (argued), Billings, for plaintiff and respondent.

MR. JUSTICE HASWELL delivered the Opinion of the Court.

In an action to recover benefits under a disability insurance policy, the policyholder was awarded $736 disability benefits and $5,000 punitive damages by jury verdict in the district court of Lewis and Clark county. From the judgment on that verdict, the order denying defendant judgment notwithstanding the verdict, and the order denying a new trial, defendant insurance company appeals.

Plaintiff is Martin Nelson, age 54, employed as a tire recapper at the Eck Tire Company in Helena, Montana where he had worked for about six years prior to the accident forming the basis of his disability claim. At the time of the accident, plaintiff carried an occupational disability policy with the defendant, Combined Insurance Company of America, an Illinois insurance company. This policy provided for certain benefits for total disability, partial disability, and medical

and hospital expenses. The exact policy coverage will be detailed later in this opinion.

Plaintiff explained his principal duties as a tire recapper in the following language:

"A. Well, recapping consists of several different jobs, of course, and about the first way to start out I guess in this would be first you lift the tire up on what we call a spreader which opens the tire up so you can see inside of it and you check it out for any breaks, nails, any blemishes or whatever it may have, and then you lift it off from the spreader and over, carry it over to the buffer which is a machine which grinds the rubber off, and from there you pack it over to what we call the builder, which is a machine where you build the recap on.

"This machine does part of the work, which doesn't do it all. You still do part of the work by hand on it, and then it's—you put what we call a curing tube in it and also a curing rim which goes in for the curing process.

"Then it is ready for to put in the mold, and so, of course, also you have these matrixes to change from one time to another. It depends upon the size of your run or the tread design you're wanting to run, and you cook these from anywheres from an hour and five minutes to two hours and forty-five minutes. That also depends a lot on the temperature that you operate your equipment on. In this particular case, I was operating them at 360 degrees, and so, of course, while you're cooking these tires you're also buffing more tires and checking more tires and other duties that you have with the tire recapping."

The tires which plaintiff was required to lift up on the spreader, carry over to the buffer, and then carry to the builder, weighed from 25 to over 100 pounds each. After placing the tire on the builder, plaintiff would there wrap rubber around the outside of the tire and place a curing rim, weighing from 30 to 65 pounds, inside the tire. Plaintiff then

had to lift the tire, curing tube, and curing rim off the builder and place it into a tire mold, all with the assistance of a hoist. Plaintiff was also required to lift a matrix, weighing from 50 to 200 pounds, inserting it into the mold partially assisted by a hoist.

Plaintiff at times was required to stack passenger and truck tires weighing from 25 to 100 pounds in floor-to-ceiling racks which at times required him to lift the tires above his head. He also loaded tires into trucks, carried boxes of rubber from the basement to the main floor, emptied barrels of scrap rubber weighing about 65 pounds, and carried cans of rubber cement weighing 40 to 45 pounds from the basement to the main floor. Plaintiff also performed miscellaneous other duties including lighting steam boilers, buffing tires, answering the phone, ordering supplies, waiting on customers and cleaning the shop.

Prior to the accident, plaintiff was able to perform all these duties himself, except during a short busy season.

On December 6, 1965, while inserting a truck matrix into the mold, plaintiff sustained a back injury. He went to his family doctor who diagnosed his trouble as an intervertebral disc syndrome, i. e. a "slipped disc". The doctor prescribed conservative treatment consisting of bed rest, exercises, and medication consisting of muscle relaxants and pain pills. After staying home for about a week and doing the prescribed exercises, plaintiff returned to work.

Upon his return to work, plaintiff was unable to perform many of the activities involved in his job. The following testimony by plaintiff summarizes the situation:

"Q. * * * how much of your work were you able to perform after this accident as compared to the amount of work that you were able to do prior to your accident? A. About a third of it.

"Q. What things were you not able to do? A. Well, I wasn't able to do any of the heavy lifting, and I wasn't able

to change the matrixes, pack up the rubber which I had to pack out of the basement, and also lifting any of the tires around or piling the tires up or putting them up in the racks which I normally would be doing.

"Q. Now, when you say 'heavy lifting,' what weights do you regard in your mind as being heavy lifting? A. Oh, anywheres from fifty pounds on up to over a hundred pounds.

"Q. When you returned to work, did you try to lift anything that weighed in excess of fifty pounds? A. No. I—I just knew I couldn't lift it because I was in too much pain to."

Basically plaintiff could not do the heavy lifting that was an integral part of his job although he could still light the furnaces, use the telephone, place orders for supplies, wait on customers, and buff and spray the tires. Plaintiff's employer furnished helpers to assist plaintiff in performing the required duties and continued to pay plaintiff the same wage as he received prior to his injury.

Plaintiff's injury was obvious to his employer, Mr. Eck, who characterized plaintiff's resulting curtailed activities on the job as follows:

"Q. But was he able to perform each and every duty that he was required to perform? A. He wasn't.

"Q. But he was able to perform some of them, is that correct? A. He could put the rubber on the tire and that was about it.

"Q. I see. And some other things which would add up to one third of this normal work? A. Well, that's about right."

Plaintiff continued to work on this basis until about April 1, 1966. Immediately prior to that date, plaintiff found he was unable to arise from the living room floor at his home. He went to his family doctor who advised hospitalization for an intervertebral disc syndrome, as originally diagnosed. After hospitalization, plaintiff was operated upon for this condition on April 6, 1966. He was hospitalized for about 17 days and

has never worked since. The pain from the original injury of December 6, 1965, continued unabated from the date of the injury to the time of his operation.

Defendant insurance company has neither a claims office nor a resident adjuster in Montana. According to plaintiff, he had his wife call Mr. Alex Smith, a sales manager for the company residing in Helena, and report the accident within a day or two after its occurrence. This is confirmed by plaintiff's wife although Mr. Smith does not remember it.

Following plaintiff's back surgery, he and his wife met Mr. Smith at his office where Smith filled out a claim form for plaintiff and provided them with a medical authorization form to be taken to their doctor. Apparently Smith sent the claim form back to defendant insurance company's home office in Illinois.

The company's claim adjusters in Illinois wrote several letters in connection with plaintiff's claim. They wrote plaintiff twice, once on September 9, 1966 and again on November 17, 1966, requesting authorization to obtain medical information. The insurance company also obtained two medical reports, one dated August 11, 1966 and the second dated September 22, 1966, both from Dr. Maronick, plaintiff's family doctor. There was also a claimant's statement form filled out but unsigned by either claimant, his doctor, or his employer, which was stamped as received in the insurance company home offices in Chicago on August 30, 1966. There was a second claimant's statement form only partially filled out, signed by claimant, the doctor, and claimant's employer, marked as received by defendant insurance company on November 25, 1966.

On December 15, 1966, the insurance company wrote plaintiff stating that it was giving careful consideration to his claim and was in the process of obtaining further information concerning it. A second letter of the same date written to

claimant's attending physician was refused admission in evidence, as was the attending physician's reply.

Additionally, defendant insurance company apparently had some correspondence with plaintiff's employer's Workmen's Compensation insurance company.

This completed defendant insurance company's investigation of plaintiff's claim which it did not pay. It did not further contact claimant himself or claimant's employer.

Plaintiff filed suit against defendant insurance company in the district court of Lewis and Clark county on July 25, 1967, to recover benefits of $840 under the total disability provision of his policy. Prior to trial, plaintiff was permitted to amend his complaint to claim an additional $10,000 for punitive damages on the basis that defendant insurance company's refusal to pay benefits under the policy violated the Montana Insurance Code, section 40-4011, R.C.M.1947, and as such was "unjust, unreasonable, oppressive, malicious, and fraudulent to plaintiff and was calculated to cheat and defraud him [the plaintiff] and deprive him of valuable contractual and property rights under said policy".

Defendant's answer amounted to a general denial based on its contention that there was no coverage under the terms of the policy.

The case was tried to a jury in the district court of Lewis and Clark county in February 1969, following denial of defendant's motion for summary judgment. At the conclusion of plaintiff's case-in-chief, defendant made these motions: (1) for summary judgment; (2) to strike the allegations and prayer for punitive damages; (3) for directed verdict on the grounds (a) no liability under the terms of the policy, and (b) punitive damages improper. There is some question concerning whether these motions were again made at the conclusion of all the evidence; but we deem it unnecessary to resolve this question.

The jury in an 8-4 verdict found for plaintiff, awarding

him $736 disability benefits under the terms of the policy and $5,000 punitive damages. Defendant insurance company appeals (1) from the judgment entered on that verdict; (2) from the order of the district court denying defendant judgment notwithstanding the verdict; and (3) from the order of the district court denying defendant a new trial.

The issues assigned for review upon this appeal can be divided into two broad categories: (1) Claimed errors relating to policy coverage for disability. (2) Claimed errors relat- to liability for punitive damages. Defendant insurance company, appellant here, lists 11 issues for review under the first broad category and 14 issues for review under the second. We deem it unnecessary to detail each such specific but will discuss the case in terms of the two broad issues only.

The first broad issue involved in this appeal is whether total disability benefits are payable to plaintiff under the coverage afforded by his occupational disability policy.

The two coverage clauses involved are Section C relating to benefits for loss of time and Section E relating to medical and hospital benefits.

Section C provides:

"TOTAL LOSS OF TIME ACCIDENT INDEMNITY—ANY ACCIDENT

"If Such Injuries shall be sustained by the Insured, and do not result in any loss for which indemnity is payable under Sections A or B, but shall within thirty days from the date of the accident causing Such Injuries, continuously, necessarily and wholly disable the Insured and prevent him from performing each and every duty pertaining to his usual business or occupation, the Company will pay periodically during such disability, beginning with the first day of disability, for a period not exceeding six consecutive months, a monthly indemnity of ........................................................................ $100.00".

Section E provides:

## "ADDITIONAL MEDICAL AND HOSPITAL INDEMNITY —ANY ACCIDENT

"If Such Injuries shall be sustained by the Insured, and do not result in any loss for which indemnity is payable under Sections A or B, but shall, during any period to total disability or partial disability for which benefits are payable under Sections C or D, necessarily confine the Insured within a hospital and shall necessitate:

"Any medical, hospital, x-ray, operation or other expense of any kind at a hospital;

"the Company in addition to the indemnity payable under Sections C or D of this policy will pay a maximum daily indemnity limit of $8.00, subject to an aggregate maximum limit of indemnity of _____ $240.00".

At the outset we note that where, as here, medical and hospital benefits under Section E are claimed on the basis of total disability coverage under Section C, benefits payable under the former depend upon coverage under the latter. Accordingly we must direct our attention to Section C.

In our view the language of Section C is plain, unambiguous, direct, and certain. Benefits are payable only in cases involving continuous and total disability within 30 days of the date of the accident preventing performance of every duty pertaining to the insured's occupation. It is difficult to conceive how any more explicit or limiting language could be used. The language of a contract governs its interpretation, if the language is clear and explicit. Section 13-704, R.C.M.1947. The intention of the contracting parties is to be ascertained from the contract itself, if possible. Section 13-705, R.C.M.1947. Where, as here, the language admits of only one meaning there is no basis for interpretation of the policy coverage under the guise of ambiguity.

"In the construction of a[n] * * * instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been

omitted, or to omit what has been inserted * * *". Section 93-401-15, R.C.M.1947.

Applying the undisputed facts of this case to the policy coverage discussed in the preceding paragraph, it is apparent thate no benefits are payable here. The insured, by his own admission, worked continuously on his job as a tire recapper for a period of 3 to 3½ months following a week layoff immediately after his injury. He testified, in substance, that he was able to do about one third of what he could do formerly on his job. While there were many duties connected with his job that he could not perform after his accident because they involved heavy lifting, he could do some of the tire buffing, some of the tire building, handle the customers, order supplies and some of the lighter duties of his job. This is not continuous and total disability to perform each and every duty pertaining to his occupation, insured within 30 days of the accident. Any other conclusion is pure sophistry.

Other courts have arrived at the same conclusion under similar facts and policy provisions. A draftsman who injured his back when the high stool on which he was sitting broke, and who worked approximately 41 out of 55 working days in an 11 week period following injury was held not entitled to benefits under an occupational disability policy that covered injuries that, "wholly, and continuously disable the [Plaintiff] from the date of the accident from performing any and every kind of duty pertaining to his occupation." Grau v. Travelers Ins. Co. of Hartford, Conn., 303 Ill.App. 212, 24 N.E.2d 882. In *Grau,* the court grounded its decision in the following language:

"We think the statement of counsel for plaintiff, which we have quoted, states the controlling question in the case. Plaintiff's own testimony shows that after plaintiff was injured he worked approximately 41 days out of 55 over a period of 11 weeks. In this state of the record, we think it obvious that plaintiff was not 'wholly and continuously disabled from

the date of accident' and therefore the court did not err in directing a verdict. (Citing cases)"

While many jurisdictions outside Montana have interpreted "total disability" to signify something less than its literal meaning (See 24 A.L.R.3d 8, for collection of cases from all jurisdictions covering the effect of resumption of work), such cases do not in the main, as here, involve further limiting language such as *preventing the policyholder from performing each and every duty pertaining to his usual occupation.* See 23 A.L.R.3d 1117 § 3, and 1141 § 14, for collection of cases from all jurisdictions. In Montana under general disability policies, we have previously recognized that in order to recover total disability benefits one need not be incapable of performing any mental or physical task. Cacic v. Slovenska Narodna, etc., 102 Mont. 438, 59 P.2d 910; Seaman v. New York Life Ins. Co., 112 Mont. 328, 115 P.2d 1005. But the controlling point here is not whether the policyholder is totally disabled in terms of abject helplessness, but whether the insured's injuries did (1) "continuously, necessarily and wholly disable the Insured" *and* (2) "prevent him from performing each and every duty pertaining to his usual business or occupation" within 30 days of the accident as required by the policy. An Ohio case denying recovery to a cone grinder in a roller bearing plant who worked for more than 14 months continuously on a piecework basis averaging $75 per week following his alleged total disability, puts the matter this way:

"It seems to us that the plain and simple meaning of 'wholly and continuously disable the insured and prevent him from performing every duty pertaining to his occupation' is entire disability and prevention from performing each one of the duties pertaining to his occupation; * * * The phrase does not say, 'wholly and continuously disabled the insured so as to prevent him from performing every duty pertaining to his occupation,' but it does say, 'wholly and continuously disable the insured *and* prevent him from performing every duty

pertaining to his occupation,' that is to say, in order not to have his weekly indemnity cease he must be both wholly and continuously disabled and prevented from performing every duty pertaining to his occupation." Yeager v. Pacific Mutual Life Ins. Co., 166 Ohio St. 71, 139 N.E.2d 48.

The coverage clause in the instant case is almost identical in pertinent parts. Accordingly, we hold as a matter of law, under the undisputed facts here, that the policyholder did not come within the policy coverage and is entitled to no benefits thereunder.

We observe in passing that the coverage here afforded by the policy is very narrow and restrictive. We leave it to the legislature to determine whether it is good public policy to permit this type of policy to be sold in Montana. As long as it is permitted, as now, such policies must be governed by their restrictive terms.

As no coverage exists in this case and plaintiff is entitled to no benefits thereunder as a matter of law, punitive damages are not recoverable in any event. Accordingly, no further discussion of this issue is necessary.

The judgment of the district court is reversed and the case dismissed.

Lest the reader be misled by the dissent of Mr. Justice John Conway Harrison, which was prepared subsequent to the foregoing majority opinion, a brief comment on the facts appears appropriate. The policyholder here raised no claim, contention or issue at the trial concerning partial disability coverage or failure of the insurance company to pay $50 in benefits thereunder. This issue is wholly extraneous to this lawsuit and constitutes nothing more than counsel's belated attempt to justify the verdict herein.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICE CASTLES, concur.

MR. JUSTICE JOHN C. HARRISON, (dissenting).

I must dissent.

As noted by the majority opinion, the coverage of the insurance policy here involved is not only narrow and restrictive but is, in my opinion, against public policy. I would not only leave it to the legislature—I would specifically call it to their attention that many of their constituents are being sold something that has little value.

Here, the claimant is totally disabled and the only reason he fails to recover insurance that he is entitled to, is that his family physician first prescribed conservative treatment, bed rest, exercise and medication, rather than immediate radical treatment—surgery. There are no facts disputing his incapacitating injury, nor would the majority decision have been the same had the physician prescribed immediate surgery within the 30 day period. However, that physician, thinking of the welfare of his patient and using his best medical judgment, tried to treat his patient without radical surgery. His decision resulted in the majority decision, for the treatment lasted longer than 30 days.

This opinion should not only be published in the legal journals, but also in the medical journals of this state, so that the medical profession in their questioning of a patient can ask those suffering from disabling injuries: "Are you covered by the Combined Insurance Company of America, an Illinois insurance company, which company's policy includes a 30 day clause, or any other company whose policy includes a 30 day limiting clause?"

While the above question has no medical diagnostic value, it might help the attending physician in his decision on when to operate.

In addition, this appellant company failed to even assist its policyholder for coverage he allegedly brought on partial loss. Section D of the policy reads as follows:

"PARTIAL LOSS OF TIME ACCIDENT INDEMNITY—ANY ACCIDENT

"If Such Injuries shall be sustained by the Insured, and do

not result in any loss for which indemnity is payable under Sections A or B, but shall, within thirty days from the date of the accident causing Such Injuries or immediately following a period of total disability for which benefits are payable under Section C, prevent the Insured from performing one or more important duties of his usual business or occupation, the Company will pay, beginning with the first day of disability, for a period not exceeding one month, a monthly indemnity of _____ $50.00".

While the above sum would not keep a family long, if the company had any good faith in its business dealings with its policyholders, it would have at least paid the $50 due and owing.