DEBORAH ROOD EVERITT,
Defendant Below-Appellant, Cross-Appellee,

*vs.*

ROBERT HOWE EVERITT, sometimes known as ROBERT EVERITT HOWE,
Defendant Below-Appellee, Cross-Appellant,

and

DELAWARE TRUST COMPANY, a corporation of the State of Delaware,
Executor under the Will of DEBORAH MORRISON ROOD, deceased,
Plaintiff Below-Appellee.

*Supreme Court on Appeal—December 3, 1958.*

*Henry M. Canby* and *Max S. Bell, Jr.,* of Richards, Layton & Finger, Wilmington, for appellant and cross-appellee.

*Vincent A. Theisen* and *Joseph T. Walsh* of Logan, Marvel, Boggs & Theisen, Wilmington, for appellee and cross-appellant.

*David F. Anderson* of Berl, Potter & Anderson, Wilmington, for Delaware Trust Co. executor.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

SOUTHERLAND, Chief Justice: ▮ This is an interpleader suit brought by Delaware Trust Company, Executor under the will of Deborah Morrison Rood. The interpleader claimants are Deborah Rood Everitt (herein "Deborah"), daughter of the testatrix, and Robert Howe Everitt (herein "Robert"), former husband of Deborah.

The dispute concerns the ownership of certain shares of the common stock of Hercules Powder Company constituting a portion of a legacy bequeathed to Robert under Mrs. Rood's will. Deborah claims that Robert, by a letter of instruction to the executor, assigned the shares to her absolutely; Robert claims that his letter assigned the shares only as collateral security for a loan.

The pertinent facts are these:

Deborah and Robert were married in 1943. Robert was then engaged in business in Mexico City. In January, 1952, he needed money for his business and asked Deborah to advance it. She arranged for a loan of $13,500 to be made to her by the Delaware Trust Company, in Wilmington, secured by 400 shares of her Hercules stock. The proceeds of the loan were deposited to Robert's account, Deborah giving her note for the loan. Robert was to pay the interest and repay the principal promptly.

Mrs. Rood died in March, 1953. Her will provided for a legacy to Robert of three per cent of her estate, after the payment of a sim-

ilar legacy to Deborah.  The estate appears to consist largely of Hercules stock.

In the years 1952 and 1953 Deborah became interested in a Mexican horse-racing enterprise, and from time to time invested in it substantial sums of money.

In early May, 1953, Deborah was preparing to go to Wilmington for talks with the executor of her mother's will.  Robert's loan was still unpaid, and she requested him to pay it.  Robert then signed and delivered to her two letters reading as follows:

"May 10, 1953

"Dear Mr. Lovett:

"Please consider this letter your authorization by me to assign to my wife, Deborah Rood Everitt, sufficient stock inherited by the undersigned from the estate of Deborah Morrison Rood to cover a loan for $13,500.00 (Thirteen Thousand Five Hundred Dollars).

"Many thanks to you for your attention to this request."

"May 10, 1953

"Dear Mr. Lovett:

"This will authorize you to use sufficient of the stock inherited by the undersigned from the estate of Deborah Morrison Rood, for loan purposes to cover a loan in the amount of $13,-500.00 (Thirteen Thousand Five Hundred Dollars).

"Deborah Rood Everitt is authorized by me to handle such a loan with your bank."

The first quoted letter (the "assignment letter") is claimed by Deborah to constitute an absolute assignment of sufficient of Robert's legacy to pay the outstanding loan of $13,500.  She says that the second quoted letter (the "pledge letter") was written first and that

it was unsatisfactory. Robert asserts that the intent of the two letters was the same and that he intended only an assignment as collateral security for a loan of $13,500.

Deborah came to Wilmington and on May 11 talked to Mr. Lovett of the trust company. She says that she left both letters with him. He has no recollection about it. The assignment letter shows the bank receipt stamp which is dated January 13, 1954. The pledge letter shows no receipt stamp.

By January, 1954, Deborah and Robert had separated and were negotiating a settlement agreement. It was executed on January 15, 1954. One of its provisions, Robert contends, had the effect of discharging Robert's indebtedness of $13,500 to Deborah. This agreement was incorporated in divorce proceedings, and a divorce was granted to Deborah shortly thereafter. Robert appealed, but the decree was affirmed on November 9, 1955.

On January 9, 1954, Deborah wrote Mr. Lovett as follows:

"I enclose a letter to you from Bob [Robert] regarding my loan of $13,500 which you deposited to Bob's account at Delaware Trust on January 9, 1952. It is self-explanatory to the effect that he wishes all and any amounts coming to him from the Deborah M. Rood estate, to be credited against this loan until fully paid and then such balance as there may be deposited to his personal account at Delaware Trust."

Deborah testified that the enclosure with this letter was the pledge letter. The Chancellor found that it was the assignment letter.

Lovett's reply of January 14 acknowledged receipt of another paper and then said:

"I have also the letter signed by Bob relative to the use of his interest in your mother's estate as protection for your loan of $13,500. I am not sure that this can be anything more than an

indication of his desires, as I believe that there is no power of assignment under the Will."

On September 17, 1954, Robert called at the trust company and saw Mr. Lovett. He acknowledged his debt of $13,500 to Deborah, which he said he wished to repay in cash and keep all his Hercules stock. He inquired what interest the bank would charge for a loan. He expressed concern about the whereabouts of the copies of the assignment letter of May 10. He asked to see the letter and noted the date—January 13, 1954—when the trust company had received it.

On September 21 Deborah called Lovett on the telephone. She spoke of Robert's indebtedness to her and objected to any settlement with Robert by the executor without collecting the $13,500. On the same day she wrote him about the matter. She said that Robert had only occasionally paid the interest on his loan, and had not paid a dollar of the principal. She referred to the assignment letter as authorizing the deduction of the amount from Robert's inheritance.

On October 1, 1954, Lovett replied, saying:

"Your letter as well as our telephone conversation gives me the understanding that if he [Robert] pays the $13,500, you are satisfied."

Robert never paid his debt of $13,500, apparently because it was discharged by the settlement agreement, subject presumably, to an affirmance of the divorce decree. He refused to recognize the assignment as absolute. Deborah insisted that she had received an outright assignment of enough Hercules stock to pay the debt. Accordingly, the executor filed the interpleader suit.

Deborah initially contested the right of the executor to interplead, alleging that it had acted wrongfully in not transferring the stock to her. The trial of this issue was subsequently deferred.

The foregoing is a summary of the important facts of the case.

The Chancellor held that the terms of the assignment were ambiguous, and that the correct interpretation of its language must be derived from the surrounding circumstances and the conduct of the parties. He concluded that Deborah had not succeeded in proving that the assignment was absolute. He therefore disallowed her claim. She appeals from that part of the judgment awarding the stock to Robert.

Robert has filed a cross-appeal, alleging error in that part of the judgment taxing costs and counsel fees.

1. We consider first the main question : Does the assignment letter import an absolute assignment or one for purposes of collateral security?

We agree with the Chancellor that the language of the assignment letter is ambiguous and that there are three possible interpretations. The word "cover" might mean "pay" or it might mean "secure". If the latter, the language may have referred to a new loan to Deborah or to the use of the legacy as collateral to be substituted for the existing loan.

Consequently all of the circumstances attending the execution of the letter and the subsequent conduct of the parties must be looked to in order to ascertain the intent of the ambiguous language.

In examining all such facts, the Chancellor took the view that the burden of proof was upon Deborah to establish the absolute character of the assignment. This burden, he held, she had failed to sustain. This approach to the question is assailed as erroneous. It is said that Deborah had clearly made at least a *prima facie* case of absolute assignment, and that the burden was upon Robert to disprove that case. This argument, we think, confuses the overall burden of proof with the burden of a defendant to go forward with evidence to meet a plaintiff's case. Since Robert's legacy was admittedly his property, and Deborah laid claim to a part of it, the overall burden of proof lay upon her to prove her claim. In any event, the point is not

of great consequence, since it is quite clear to us that the Chancellor found from the evidence enough facts to support the conclusion that the assignment was for the purpose of security only.

The circumstances upon which this conclusion is founded are set forth in detail in the Chancellor's opinion. It is based not only upon the documentary evidence but also upon the oral testimony of the witnesses. In so far as his findings rest upon the oral testimony, they are entitled to very great weight. *Hob Tea Room, Inc., v. Miller,* 33 *Del.Ch.* 38, 89 *A.2d* 851.

Since we think that the Chancellor's conclusion is fully sustained by the evidence, both documentary and testimonial, we content ourselves with a summary of the principal circumstances which we think decisive of the matter.

(1) The Chancellor's rejection of Deborah's testimony on several disputed points, including her testimony concerning the enclosure with her letter of January 9, 1954 to Lovett, necessarily discredits her testimony of the understanding between her and Robert when the two letters were written.

(2) A comparison of the two letters shows, as the Chancellor said, that neither letter indicates an intention to assign an amount of stock sufficient to *pay* the existing loan of $13,500. The language of both letters suggests the use of the stock for collateral.

(3) In his reply to Deborah of January 14 Lovett characterized the assignment letter as authorizing the use of Robert's interest in Mrs. Rood's estate "as protection for your loan of $13,500." It was a natural inference, in the light of the identity between the amount of the existing loan and the amount specified in the letter. Deborah never challenged this interpertation.

(4) Robert continued to pay interest on the existing loan long after May 10, 1953. If the letter had been an assignment, it would have stopped the running of interest. Deborah replies (1) that there

was an agreement that Robert should continue to pay interest, and (2) that since the estate could not be distributed on May 10, 1953, there is nothing inconsistent between an absolute assignment of his stock and the interest payments. The first contention was rejected by the Chancellor, and the second argument we cannot follow. If the assignment was absolute Deborah would have been entitled to the income (equitable income) on the share of the estate assigned to her, but Robert's debt to her and his consequent obligation to pay interest would have been extinguished.

(5) Lovett's letter to Deborah of October 1, 1954, referring to a previous telephone conversation with her indicates again that he believed that Deborah was merely demanding payment of Robert's debt in due course and not demanding the stock that she now claims was assigned to her.

(6) Robert's interview with Lovett in September of 1954 is entirely consistent with the existence of a debt to Deborah, but not with an assignment to her of any of his Hercules stock.

(7) Robert claimed, contrary to Deborah's testimony, that she needed money in May, 1953, for financing her race-track venture. The Chancellor in effect so found. This finding is strongly assailed, but we think it is of minor importance. Even if Deborah did not wish to borrow money herself, and the assignment is considered merely as security for the existing loan, she is, as the Chancellor said, in no better case.

Several other minor points in the case are discussed in the briefs, but we find it unnecessary to pass upon them.

The foregoing summary of the evidence convinces us that the record fully sustains the Chancellor's conclusion awarding the disputed stock to Robert.

We uphold the Chancellor's judgment on the merits.

■ 2. We turn now to the cross-appeal of Robert, which concerns the assessment of costs.

After the Chancellor's decision on the merits, all parties filed application for taxation of costs, including counsel fees. Delaware Trust Company, interpleading plaintiff, asked that it be allowed its costs and counsel fees from the fund in court. Deborah asked that her costs and counsel be likewise paid from the fund. Robert asked that his costs and counsel fees be paid by Deborah.

The Chancellor allowed the executor its costs and counsel fees and taxed them against the fund, refusing to assess them against Deborah. He refused the other two applications, thus leaving each claimant to pay his own counsel fees. The court costs he taxed equally against Deborah and Robert.

Robert appeals. He urges that the Chancellor should have taxed against Deborah (1) the costs and counsel fees of the executor, (2) his own counsel fees, and (3) all the court costs.

### (1) *The executor's costs and counsel fees.*

■ Robert makes no objection to the allowance. He contends, however, that although the executor's costs and counsel fees are in the first instance payable out of the fund, the ultimate liability for these amounts is that of the losing party. He cites *Globe Indemnity Co. v. Puget Sound Co.*, 2 *Cir.*, 154 *F.2d* 249. This case announces the general rule, accepted by the Chancellor, that the interpleading plaintiff's costs and counsel fees are allowed in the first instance against the fund, and that in the ordinary case they are ultimately taxed against the unsuccessful party. See *Richards v. Salter*, 6 *Johns.Ch.* 445; *Miller v. DePyster*, 1 *Abb.Prac.* 234; *McNamara v. Provident Sav. Life Assur. Soc.*, 5 *Cir.*, 114 *F.* 910. But the cases supporting the general rule recognizes that the awarding of costs is always within the sound discretion of the Chancellor. "As in all equity suits, costs are within the discretion of the court, and depend somewhat upon the circumstances of the case." 4 *Pomeroy Equity*, §1328, note 9. Here the Chancellor

exercised his discretion in disallowing to Robert recovery of the plaintiffs' costs. He said:

> "When the equities are considered here, particularly the fact that Robert wrote and delivered the ambiguous assignments to Deborah, I am persuaded that the property involved, and thus Robert, should bear plaintiff's attorneys' fees."

As we understand Robert's contention he does not question the right of the Chancellor to consider the equities of the case in taxing these costs. He does say that one important consideration in his favor was disregarded. Deborah, he says, initially contested the right of the executor to interplead and thus caused the amount of its counsel fee to be increased. This fact, he argues, should have been taken into account on fixing the ultimate liability for the fee. The Chancellor referred to the fact that Deborah's initial defense to the action did have the effect of keeping the executor in the suit so far as concerned the pleadings—that is, until the contest was withdrawn the executor on the face of the pleadings was faced with a charge of wrongdoing. He expressly declined, however, to consider this point in fixing the plaintiff's costs and counsel fees.

The amount of the allowance is not criticized, and we think that it was for the Chancellor to determine whether any weight should be given to the circumstance of Deborah's contest, and if so how much. The taxation of costs and allowances is a matter peculiarly within his discretion. *Cf.* 10 *Del.C.* § 5106. We see no reason for disturbing his findings.

## (2) *Robert's counsel fees.*

No authority is cited for the proposition that in an interpleader action the counsel fees of the successful claimant may be taxed against the losing party. Certainly in the ordinary case of interpleader the suit becomes merely a contest between the two claimants. The usual rule in such a case is that each party must pay his own counsel fees. *Maurer v. International Re-Insurance Corp.*, 33 *Del.Ch.* 456,

462, 95 *A.2d 827.* Robert cites *Am.Jur.* § 28, which we cited in the Maurer case. The text recognizes the rule that the successful claimant is entitled to a decree against the other defendant "for the costs so take out of the fund, as well as for his own costs." The case cited in support of the text deals with the successful defendant's court costs, not with his counsel fees. Robert argues that his counsel fee is part of his "costs". This begs the question. Whether counsel fees constitute "costs" must depend on the nature of the case. Ordinary court costs are usually allowed to the prevailing party, but counsel fees as part of allowable costs are exceptions, *Maurer v. International Re-Insurance Corp., supra.* This case does not fall within any of the exceptions.

We agree with the Chancellor that Robert's counsel fee was not allowable to him as a part of his costs.

### (3) *The court costs.*

The Chancellor divided these costs between Deborah and Robert. No reason is assigned for distributing his allocation. Again the matter was clearly within his discretion.

For the reasons above given, the judgment of the Court of Chancery is affirmed.