**Mark A. CASSON, Plaintiff,**

v.

**NATIONWIDE INSURANCE COMPANY, Defendant.**

Superior Court of Delaware, New Castle County.

Submitted: May 27, 1982.
Decided: Sept. 20, 1982.

Stephen P. Casarino of Tybout, Redfearn, Casarino & Pell, Wilmington, for plaintiff.

Mason E. Turner, Jr. of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for defendant.

WALSH, Judge.

This case involves an action for damages arising from the alleged breach of the Personal Injury Protection (P.I.P.) clause of an automobile insurance contract issued by the defendant, Nationwide Insurance Company (Nationwide) to the plaintiff, Mark A. Casson.

Initially, plaintiff sought reimbursement for lost earnings he sustained following an automobile accident which occurred on July 5, 1979, but later amended his complaint to seek attorney's fees as well as punitive damages for malicious breach of contract, and tortious breach of an insurer's duty of good faith dealing with an insured. After discovery, plaintiff filed a motion for summary judgment on the issue of breach of contract while Nationwide seeks partial summary judgment on plaintiff's claim to punitive damages and attorney's fees.

The following factual basis for determination of these motions has been drawn from the pleadings and the discovery record and, to the extent necessary, is viewed from a perspective which favors the respective non-movant. *Shultz v. Delaware Trust Co.,* Del.Super., 360 A.2d 576 (1976).

Immediately following the accident, plaintiff went to the Wilmington Medical Center where he was treated for a back complaint and released. The following week, plaintiff consulted his family physician who referred him to Dr. Theodore Strange, an orthopedic specialist, for treatment. On July 10, 1979, x-rays of plaintiff's cervical, dorsal and lumbar spine were found to be within normal limits.

Plaintiff first saw Dr. Strange on July 27, 1979, and according to plaintiff's deposition he continued treatment with him on a monthly basis until the doctor's retirement in approximately August of 1980. There is, however, no other evidence of record which indicates that plaintiff was under active treatment with Dr. Strange between the visits of January 10, 1980, and August 19, 1980, which lends some justification to Nationwide's belief that he had abandoned efforts toward recovery. Beginning in September, 1980, plaintiff began treatment with Dr. Monteleone and was still under his care at the time plaintiff was deposed on March 26, 1981. Dr. Monteleone reported to Nationwide on March 9, 1981, that plaintiff was unable to work.

From December, 1977, until the time of the accident, plaintiff had been employed as an ironworker's apprentice. Due to the nature of this work which involved climbing, lifting and pulling heavy weights, Dr. Strange advised plaintiff not to return to this employment. Since the accident, plaintiff has neither returned to this employment nor sought another type of work. During August and September 1980, plaintiff did make several visits to the union hall to inquire about "light duty," but was informed that no such work was available for an ironworker. Plaintiff's apprenticeship was terminated by the union in November,

1980, due to his inability to complete the on-the-job training.

The policy issued to plaintiff by Nationwide provides for Personal Injury Protection (P.I.P.) benefits including compensation for medical expenses and loss of earnings for "bodily injury" received while the occupant of a motor vehicle involved in an accident. In addition to the statutorily mandated $10,000.00 minimum coverage, Casson had $90,000 of extended coverage in force at the time of the accident.

In accordance with the policy requirements, plaintiff provided written notice of the accident which was received by Nationwide on July 12, 1979. Plaintiff's claim for P.I.P. was originally adjusted by Pamela Meredith who, after obtaining verification of wages from his employer and verification of disability from Dr. Strange, began making payments of net lost earnings on September 5, 1979, retroactive to the date of the accident.

Dr. Strange's first report to Nationwide, in August, 1979, indicated that Casson "was disabled or unable to work from July 5, 1979, to present," and that it was undetermined as to when he would be able to return to work. Subsequent reports dated October 22, 1979, and January 17, 1980, based on recent examinations of the plaintiff echoed Dr. Strange's previous determination.

On January 14, 1980, when payments made under plaintiff's claim approached $10,000.00 his case was transferred to Aleta Callahan, an office adjuster, who continued paying benefits. On January 18, 1980, Callahan sent a request to Dr. Strange asking whether it was advisable for plaintiff to undergo rehabilitation. The response dated January 23, 1980, indicated that a program designed to strengthen plaintiff's back muscles and increase motion in that area would be advisable. Callahan discussed the possibility of rehabilitation with the plaintiff in early March, 1980. Callahan's deposition indicates that plaintiff verbally agreed to rehabilitation at defendant's expense and his case was assigned to International Rehabilitation Associates (I.R.A.). However, when I.R.A. later contacted plaintiff to set up his rehabilitation, he refused to participate.

Plaintiff has undergone physical therapy for his condition at Possum Park Medical Center as prescribed by Dr. Strange, three times each week beginning shortly after the first examination by Dr. Strange and continuing until Dr. Strange's retirement, when it was discontinued for an undetermined period. Plaintiff indicated that therapy was taken at Rehabilitation Consultants upon the recommendation of Dr. Monteleone, but was discontinued January 28, 1981, because plaintiff claimed it did not help his condition.

In addition to the information provided by Dr. Strange, Nationwide had plaintiff examined on several occasions by a physician of its selection, Dr. Joseph Arminio. Dr. Arminio examined plaintiff on February 26, 1980, and determined that he was "incapacitated from performing the heavy work as an ironworker." The incapacity was found to continue in June of that year by Dr. Arminio who was told by plaintiff that he did not want "trigger area injections" which Dr. Arminio suggested as a diagnostic procedure.

On July 14, 1980, Callahan presented plaintiff's file to Mr. Coates, the District Manager, for review. Coates decided to have plaintiff's "lost earnings" benefits discontinued as of that date due to his refusal to undergo rehabilitation or to maintain active medical treatment, and because there was no updated medical information.

On August 19, 1980, plaintiff was again examined by Dr. Strange who continued his same diagnosis. In a letter to plaintiff's counsel dated September 12, 1980, concerning this examination, Dr. Strange stated that since Casson was not recovering, his condition was apparently permanent. A report of this examination was also sent to defendant on December 8, 1980, echoing all previous reports that plaintiff had been disabled since the accident and that it was

undetermined as to when he could return to work.

Two other physicians examined the plaintiff. Dr. Phoon found tenderness in the lower dorsal spine but was of the opinion that such a soft tissue injury should have healed since the accident. On three occasions in January and February of 1981, plaintiff visited Dr. David Stevens in connection with his claim for health and accident insurance coverage under a policy with First Federated Life Insurance Company. Dr. Stevens reviewed laboratory tests, myleograms, x-rays and EMG's and concluded that although plaintiff's subjective symptoms were real, there was no objective evidence supporting his complaint. Dr. Stevens diagnosed plaintiff's condition as a chronic post-traumatic lumbar strain, but based on the lack of objective findings was of the opinion that he was fit to return to his occupation as an ironworker.

## I

■ In order for an insured to establish the contractual liability of an insurer for an alleged breach of an insurance agreement, he must show that (1) there was a valid contract of insurance in force at the time of the loss, (2) the insured has complied with all conditions precedent to the insurer's obligation to make payment, and (3) the insurer has failed to make payment as required under the policy. See generally, 46 C.J.S., *Insurance*, §§ 1271–1285 at 318–337. The only element here at issue is whether, viewing the facts in the light most favorable to Nationwide, plaintiff had complied with all conditions created by statute, explicit in the insurance policy, or implied by law.

■ Not every refusal to pay a claim of insurance will constitute breach of contract by the insurer. *Lawton v. Great Southwest Fire Ins. Co.*, 118 N.H. 607, 392 A.2d 576 (1978). Absent waiver or estoppel, an insurer may assert substantial non-performance of any condition as a defense to any proceeding against it on a policy. *Bacon v. American Insurance Co.*, 131 N.J.Super. 450, 330 A.2d 389 (1974), aff'd., App.Div., 138

N.J.Super. 550, 351 A.2d 771 (1976). Nationwide asserts that plaintiff was derelict in three areas of cooperation under the policy of insurance: (1) failure to provide updated medical information, (2) failure to maintain active medical treatment and (3) refusal by plaintiff to undergo rehabilitation. These contentions will be separately considered.

■ Nationwide's first basis, absence of updated medical records, is clearly without merit. The policy provides that the insured must submit to physical examinations by physicians selected by Nationwide whenever and as often as reasonably requested. The insured was also required to furnish Nationwide with medical reports and records as requested. The plaintiff complied with these requirements. He submitted to several examinations by Nationwide's physicians and authorized defendant to receive reports from his treating physicians. If Nationwide lacked current medical information, it was not attributable to plaintiff's lack of response. To the contrary, any lack of information needed by the insurer was due to its own failure to make such requests as permitted under the contract. An insurer cannot take advantage of an insured's failure to perform conditions where the insurer itself was the cause. *Howley v. Scranton Life Ins. Co.*, 357 Pa. 243, 53 A.2d 613 (1947).

■ Defendant's second and third contentions can be considered together and raise the issue whether the insured might be prevented from recovery under a P.I.P. provision if he has failed or refused to take curative measures to minimize the amount of lost earnings. At first glance, the language of the no-fault statute suggests a duty of minimization. The "No-Fault" Act requires that an insurer, as minimum coverage, provide "Compensation to injured persons for *reasonable and necessary* expenses incurred within 2 years from the date of the accident for: ... 2. Net amount of lost earnings." 21 *Del.C.* § 2118(a)(2) a. 2. (emphasis added).

"Loss of earnings" is defined in Delaware Insurance Commissioner's Amended Regulation No. 9, Dec. 20, 1972, to mean, "any amounts actually lost, net of taxes on income which would have applied by reason of inability to work and earn wages or salary ... that would otherwise have been earned in the normal course of an injured person's employment."

In this context, the term "reasonable" is deemed to refer to the amount of lost earnings, while "necessary" must be interpreted to mean those lost earnings which are "unavoidable" or "inescapable." This limitation has the effect of requiring that "lost earnings," under the statute be reduced by any income from substitute work actually performed by the insured or by income he would have earned in available substitute work he was capable of performing but unreasonably failed to undertake. The Pennsylvania No-Fault Act offers guidance in interpretation. Compare, Uniform Motor Vehicle Accident Reparations Act, § 1(5)(ii) and Commissioner's Comments to § 1; Pa.Stat.Ann., Title 40, § 1009.103 (Purdon) (Supp.1982). To afford this section any other construction would leave the term "necessary" devoid of any meaning. I conclude, therefore, that under Section 2118 the insured does have a duty to mitigate by seeking substitute employment.

But Section 2118 fixes a statutory minimum rather than a maximum standard of protection and the act expressly permits the issuance of policies providing for more extensive coverages. 21 *Del.C.* § 2118(c).

The P.I.P. endorsement contained in Nationwide's policy states: "We will pay for loss of earnings, meaning *employment income actually lost,* within two years after the accident, net of .taxes, *if the bodily injury prevents the insured from working at his normal employment."* (emphasis added).

Where an ambiguity exists, the terms of an insurance contract must be construed strongly in favor of the insured and against the insurer. *Novellino v. Life Ins. Co. of North America,* Del.Supr., 216 A.2d 420 (1966); but where the language is clear, both the insurer and insured are bound by its terms. *Lamberton v. Travelers Indemnity Co.,* Del.Super., 325 A.2d 104 (1974). Here, the language of the policy is free from any ambiguity and is susceptible of only one meaning—the language of the policy has extended the statutory minimum coverage by eliminating the requirement of "necessary" from its provision. As a result the standard of recovery is earnings *"actually lost,"* without qualification. While income from substitute work actually performed might reduce the insured's recovery, there is no affirmative duty on the insured to seek such substitute employment and his entitlement is not conditioned on such effort. This interpretation of policy enlargement finds support in the language of the policy's medical expense clause which, by contrast, retains the statutory language of "reasonable and necessary." [1]

Even though plaintiff was under no duty to minimize Nationwide's liability for lost wages by seeking appropriate substitute employment, and to pursue rehabilitative measures toward that end, the question remains as to whether he was obligated to submit to medical and rehabilitative treatment to lessen his disability and return him to his normal employment.

On this issue there is a conflict of authority. See, generally 44 Am.Jur.2d, *Insurance* § 1629 at 540; 15 Couch on Insurance 2d, § 53:168–171 at 166–169. Accordingly to what appears to be the majority view, and that espoused by the plaintiff, in the absence of a contractual requirement an insured need not attempt to minimize his disability by undergoing medical treatment.

1. This difference between Section 2118 and Nationwide's policy is analogous to the distinction between "occupational" disability and "general" disability clauses found in disability insurance provisions. See, generally, *Ohrel v. Conti-*

*nental Casualty Co.,* 138 N.J.Super. 170, 350 A.2d 310, 313–314 (1975). This analogy is limited, however, in that such clauses insure against loss of capacity to work, whereas "No-fault" insures against loss of income.

This is based upon the principle that an insured should not be required to incur expense or risk injury or death where the insurer who drafted the contract did not incorporate such a provision. The imposition by law of such a requirement would, in effect, enlarge the terms of the policy beyond those agreed to by the parties. See, e.g., *Pacific Mutual Life Ins. Co. v. Matz,* 102 Colo. 587, 81 P.2d 775 (1938); *John Hancock Mut. Life Ins. Co. v. Spurgeon,* 175 Tenn. 319, 134 S.W.2d 155 (1939); *Seaman v. New York Life Ins. Co.,* 112 Mont. 328, 115 P.2d 1005 (1941).

█ Delaware decisional law is aligned with the opposite view—that an insured must submit to treatment to which a reasonably prudent man would ordinarily submit if the disability is correctable. *Culver v. Prudential Ins. Co. of America,* 36 Del. 582, 179 A. 400 (1935); *Coughlin v. Connecticut Gen. Life Ins. Co.,* Del.Super., 330 A.2d 159 (1974); See also, *Mutual Life Ins. Co. of N.Y. v. Ellison,* 5th Cir., 223 F.2d 686 (1955); *Deakter v. Mutual Life Ins. Co.,* 12 F.Supp. 182, W.D.Pa., (1935); *Aetna Life Ins. Co. v. Sanders,* 192 Ark. 590, 93 S.W.2d 141 (1936); *Kordulak v. Prudential Ins. Co. of America,* D.C. 15 N.J.Misc. 242, 190 A. 325 (1937).

If the insured fails or refuses to submit to reasonable treatment recommended by competent physicians, he is precluded from recovery for the disability for the period the cure would have become effective. *Sanders,* supra. *Culver,* supra suggests that such failure may preclude any recovery under the disability policy.

█ In this case the result would be the same under either minimization theory since it is universally recognized that, in tort actions, the injured party must act reasonably to minimize the disability and mitigate damages. This approach has been extended to Workmen's Compensation cases by analogy. See, *Spurgeon,* supra; *Kordulak,* supra; *Matz,* supra, on the basis that the workmen's compensation remedy is a statutory substitute for common law tort recovery. See, generally 81 Am.Jur.2d, *Workmen's Compensation,* §§ 1–3, at 698–702.

This rationale is equally applicable to an action on a "No-Fault" policy. Our Supreme Court has noted that the no-fault statute did not change the nature of the insured's claim from one for damages arising from a personal injury. *Nationwide Ins. Co. v. Rothermel,* Del.Supr., 385 A.2d 691 (1978). Its purpose is to insure prompt payment to an insured party for medical expenses and lost earnings which would otherwise be assessable against the tortfeasor. *DeVincentis v. Maryland Cas. Co.,* Del.Super., 325 A.2d 610 (1974). The same duty to mitigate should exist in either case.

I conclude that the duty to minimize a claimed disability is a condition precedent to Nationwide's liability under the contract with plaintiff and that such condition was implied in the policy as a matter of law. Read together with the express terms of the contract this duty required plaintiff to submit to reasonable treatment and rehabilitative measures, authorized by competent physicians, if such measures would assist in plaintiff returning to his normal employment.

█ In determining what constitutes unreasonable refusal to submit to treatment each case must rest upon its peculiar facts and circumstances, and when, as here, the facts are in sharp dispute, a jury question is presented. *Sanders,* supra; *Culver,* supra. Factors to be considered in making this determination include: (1) the risk involved in the recommended treatment, (2) pain and discomfort resulting therefrom, (3) the prospect that the disability will be removed by the treatment, enabling return to work, and (4) whether a reasonable person would submit to the treatment. *Coughlin,* supra; *Kordulak,* supra; *Ratliff v. Celebrezze,* 6th Cir., 338 F.2d 978 (1964).

█ In this case the following factual determinations are posed for the jury:

(1) whether the diagnostic procedure (trigger area injection) proposed was attended with risk, pain or discomfort;

(2) whether the rehabilitation program proposed by Nationwide, and the diagnostic procedure in paragraph (1) above offered a reasonable prospect of recovery from the incapacity which plaintiff alleges;

(3) whether plaintiff, if he had submitted to the recommended treatment, would have been able to return to his normal employment within the two year period for which Nationwide was liable for lost earnings;

(4) the extent and continuity of plaintiff's physical therapy and other medical treatment and whether it was sufficient rehabilitative effort on his part.

Under the legal standards here applied there are presented genuine issues of material fact concerning Nationwide's contractual liability. Accordingly, plaintiff's motion for summary judgment must be denied.

## II

Plaintiff additionally claims that Nationwide's refusal to pay lost earnings after July 14, 1980, constituted wanton, wilful, malicious or bad faith conduct. Plaintiff, therefore, urges this Court to adopt the position that such conduct by an insurer creates a cause of action which sounds in tort as well as contract, permitting recovery for consequential damages for economic loss, emotional distress and punitive damages.

Exemplary damages are not recoverable as a general rule in a pure action for breach of contract. *J.J. White, Inc. v. Metropolitan Merchandise Mart,* 48 Del. 526, 107 A.2d 892 (1954) and, traditionally, recovery for breach of an insurance contract is confined to the actual amount owed under the contract plus legal interest. *Lawton,* supra; *A.A.A. Pool Service & Supply, Inc. v. Aetna Casualty & Surety Co.,* R.I.Supr., 395 A.2d 724 (1978); 11 Williston, Contracts, § 1410 at 603 (3d ed. 1968).

However, plaintiff points to a developing decisional trend which sanctions recovery of punitive damages against an insurer whose breach of contract rises to the level of wilful, wanton, fraudulent or malicious conduct. See, *Standard Life Ins. Co. of Indiana v. Veal,* Miss.Supr., 354 So.2d 239 (1978); *Greenspan v. Commercial Ins. Co. of Newark, N.J.,* N.Y.Supr., 57 A.D.2d 387, 395 N.Y.S.2d 519 (1977); *Diamond v. Mutual Life Ins. Co. of N.Y.,* N.Y.Supr., 77 Misc.2d 528, 356 N.Y.S.2d 164 (1974); cf. *Food Fair Stores, Inc. v. Hevey* 275 Md. 50, 338 A.2d 43 (1975).

Apparently no Delaware case has directly addressed the issue. I am satisfied that, given a proper set of circumstances, our courts would authorize recovery of punitive damages in egregious cases of wilful or malicious breach of contract. *McClain v. Faraone,* Del.Super., 369 A.2d 1090 (1977); *Guthridge v. Pen-Mod, Inc.,* Del.Super., 239 A.2d 709 (1967); *Nash v. Hoopes,* Del.Super., 332 A.2d 411 (1975).

If the test for recovery of punitive damages against an insurer be one of wilful or malicious conduct, it is obvious that plaintiff has failed to demonstrate a genuine factual dispute in that regard. An assertion of malice without factual basis is insufficient. *Stephens v. Melson,* D.Del., 426 F.Supp. 1022 (1977). Here the plaintiff has simply alleged that defendant's refusal to make payments was a deliberate attempt to deny him benefits due under the insurance policy. The facts of record, however, fail to show any element of ill-will, hatred or intent to cause injury to the insured which would support a finding of malicious conduct.

Plaintiff contends, however, that the conduct by the insurer need not amount to wilful or malicious conduct to permit recovery. It is argued that a bad faith refusal on the part of the insurer to pay the insured justifies an award of punitive damages and decisions in other jurisdictions so indicate. *Wallace v. Prudential Ins. Co. of America,* 12 Ill.App.3d 623, 299 N.E.2d 344 (1973); *Curtiss v. Aetna Life Ins. Co.,* App., 90 N.M. 105, 560 P.2d 169 (1976); *Bibeault v. Hanover Ins. Co.,* R.I.Supr., 417 A.2d 313 (1980). Plaintiff further argues that an insurer's bad faith refusal to make payments due under a contract of insurance, breaches an

implied duty to deal fairly and in good faith with an insured and creates an independent cause of action in tort for mental suffering. *Gruenberg v. Aetna Ins. Co.,* 9 Cal.3d 566, 510 P.2d 1032 (1973); *Ledingham v. Blue Cross Plan,* 29 Ill.App.3d 339, 330 N.E.2d 540 (1975); rev'd on other grounds. 64 Ill.2d 338, 1 Ill.Dec. 75, 356 N.E.2d 75 (1976); *United States Automobile Ass'n v. Werley,* Alaska Supr., 526 P.2d 28 (1974); *Bibeault,* supra; *Veal,* supra.

If it be assumed that either cause of action is recognized in Delaware, in order to establish "bad-faith" the plaintiff must show that the insurer's refusal to honor its contractual obligation was clearly without any reasonable justification. *Nobel v. National American Life Ins. Co.,* App., 128 Ariz. 196, 624 P.2d 874 (1979); 3 Appleman, *Insurance Law and Practice,* § 1612, at 367–372. (Revised ed., 1967). This standard of reasonableness tests the judgment of the insurer's agent in deciding to contest the insurer's liability in the face of a claim. The ultimate question is whether at the time the insurer denied liability, there existed a set of facts or circumstances known to the insurer which created a bona fide dispute and therefore a meritorious defense to the insurer's liability. Compare, *Wolf v. Mutual Benefit Health and Accident Ass'n.,* 188 Kan. 694, 366 P.2d 219 (1961) and, generally 3 Appleman, *Insurance Law and Practice,* Ch. 86, "Damages for Refusal of Payment;" Ch. 87, "Justification of Delay or Nonpayment," (each discussing good faith in regard to imposition of statutory penalties on insurers).

Where the issue to be tried is one of disputed fact, the question of bad faith refusal to pay should not be submitted to the jury unless it appears that the insurer did not have reasonable grounds for relying upon its defense to liability. Compare, *Coleman v. Metropolitan Life Ins. Co.,* Mo. App., 127 S.W.2d 764 (1936) (statutory penalty); *Allen v. National Liberty Life Ins. Co.,* 153 Ga.App. 579, 266 S.E.2d 269 (1980). Here, in denying plaintiff's motion for summary judgment, I have already decided that plaintiff's refusal to undergo certain diagnostic procedures and rehabilitative measures presented a material factual dispute requiring a jury determination as to whether or not he had complied with a condition precedent. Implicit in that ruling is a determination that a bona fide dispute existed. Even if plaintiff is afforded the benefit of all factual inferences, as the party resisting summary judgment in this issue, the record simply fails to support his argument that no reasonable basis existed for the termination of benefits.

While the insurer's position may ultimately be determined to have been improper in the sense that it did not conform to its contractual obligation, there is no basis in this record to subject it to an extra-contractual claim which requires a showing of arbitrariness. Since there is no disputed issue of material fact and Nationwide's entitlement to contest the claim has been legally established, it is entitled to partial summary judgment on that portion of plaintiff's complaint which seeks recovery of punitive damages.

### III

The final question presented concerns the liability of Nationwide for attorney's fees. Plaintiff contends that Nationwide's conduct in resisting his claim was so patently unjustified as to require a shifting of fee responsibility.

In Delaware, it is well-settled that ordinary court costs are usually allowed to a prevailing party. *Walsh v. Hotel Corp. of America,* Del.Supr., 231 A.2d 458 (1967); Super.Ct.C.R. 54(d); 10 *Del.C.* § 5101. But allowance of counsel fees as part of the costs is the exception to the general rule. *Walsh,* supra; *U.S. Industries, Inc. v. Gregg,* D.Del., 457 F.Supp. 1293 (1978) aff'd. 605 F.2d 1199 (1979); cert. den., 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980). As our Supreme Court has noted, "[W]isely our courts have been very cautious in approving exceptions to that general rule." *Walsh,* supra at 462.

In an action at law, a court may not order the payment of attorney's fees as part of costs to be paid by the losing party unless the payment of such fees is authorized by some provision of statute or contract. *Honaker v. Farmers Mutual Insurance Co.,* Del.Super., 313 A.2d 900 (1973); *J.J. White, Inc. v. Metropolitan Merchandise Mart,* supra; *Great American Indemnity Co. v. State,* 32 Del.Ch. 562, 88 A.2d 426 (1952); *Maurer v. International Re-Insurance Corp.,* 33 Del.Ch. 456, 95 A.2d 827 (1953).

The plaintiff does not invoke a contractual provision, but insists that authority for granting attorney's fees is present in the Delaware Insurance Code. In particular, plaintiff argues that Nationwide's conduct in respect to his claim amounts to an unfair claims settlement practice as defined in 18 *Del.C.* § 2304(16); that such conduct constitutes a deceptive trade practice and, therefore, assessment of attorney's fees against the defendant is permitted under 6 *Del.C.* § 2533(b). This argument is without merit. Under § 2304(16), to constitute an unfair claims settlement practice, the proscribed conduct must be performed "with such frequency as to indicate a general business practice." Even if plaintiff's allegations are accepted, there has been no claim concerning the frequency of such conduct. Furthermore, plaintiff has made no allegation of fact which would bring Nationwide's conduct within the statutory definition of deceptive trade practices contained in 6 *Del.C.* § 2532. In short, there is no statutory basis for an award of attorney's fees in this case.

The plaintiff further claims that an award of attorney's fees is appropriate here because of alleged bad faith conduct exhibited by Nationwide. As previously discussed, the finding of a reasonable justification for Nationwide's action in terminating plaintiff's benefits precludes, as a matter of law, a finding of bad faith, wanton or oppressive conduct. Even if it were otherwise, absent contractual or statutory authority, counsel fees could not be awarded in this case.

The plaintiff's argument relies on a number of cases where courts sitting as mixed courts of law and equity have exercised equitable jurisdiction to award attorney's fees under extreme factual circumstances. *F.D. Rich Co. v. United States Industrial Lumber Co.,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); *Mustachio v. Ohio Farmers Insurance Co.,* 44 Cal.App.3d 358, 118 Cal.Rptr. 581 (1975); *Harkeem v. Adams,* 117 N.H. 687, 377 A.2d 617 (1977); *Sukup v. State,* 19 N.Y.2d 519, 281 N.Y.S.2d 28, 227 N.E.2d 842 (1967). In Delaware also it has been long recognized that a court of equity has jurisdiction to award counsel fees as part of costs in a proper case. *Wilmington Medical Center v. Severns,* Del. Supr., 433 A.2d 1047 (1981); *Maurer,* supra; *Mencher v. Sachs,* 39 Del.Ch. 366, 164 A.2d 320 (1960); *Wilmington Trust Co. v. Coulter,* Del.Ch., 208 A.2d 677 (1965); *Everitt v. Everitt,* 37 Del.Ch. 512, 146 A.2d 388 (1958).

The foundation for this historic practice of granting reimbursement for the costs of litigation other than conventional taxable costs is part of the original authority of the Chancellor to do equity. *Maurer,* supra. This rule has been codified in 10 *Del.C.* § 5106 which provides that "[t]he Court of Chancery shall make such orders concerning costs in every case as is agreeable to equity." This statutory reference to costs has been interpreted to include counsel fees where equity requires. *Wilmington Trust Co.,* supra.

Apart from authorization in statute or contract, equity is the only basis for awarding attorney's fees to a successful party against another party or fund. Plaintiff's request that this Court exercise equitable jurisdiction is misdirected. If attorney's fees are to be awarded an insured in successful actions in law against an insurer, the entitlement must be legislatively established. Indeed such authority is conferred in 18 *Del.C.* § 4102 with regard to claims under property insurance contracts. A similar provision in either Chapter 39 of that Title, "Casualty Insurance Contracts" or in the Delaware "No-Fault" provisions, is conspicious by its absence.

For the reasons stated, plaintiff's motion for summary judgment is denied and defendant's motion for partial summary judgment on the issues of tort liability, punitive damages and attorney's fees is granted.

IT IS SO ORDERED.