SUPERIOR COURT
OF THE
STATE OF DELAWARE

ABIGAIL M. LEGROW
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
TELEPHONE (302) 255-0669

July 21, 2022

Ian Connor Bifferato, Esq.
The Bifferato Firm, P.A.
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801

Thad J. Bracegirdle, Esq.
Justin C. Barrett, Esq.
Bayard, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19801

RE: ***Sean Callahan, Timothy Newbold, and Mark Cleaver v. iLight Technologies, LLC, f/k/a Luminii Purchaser, LLC.*** <u>**C.A. No. N21C-08-255 AML (CCLD)**</u>

Dear Counsel:

Briefly summarized, Plaintiffs Sean Callahan ("Callahan"), Timothy Newbold ("Newbold") and Mark Cleaver ("Cleaver") (collectively, "Plaintiffs") are shareholders and officers of Optiva Technologies, Inc. f/k/a iLight Technologies, Inc. ("Optiva").[1] Optiva sold its Architectural Lighting Division to Defendant iLight Technologies, LLC f/k/a Luminii Purchaser, LLC ("iLight") in the Fall of 2020.[2] In

---

[1] Compl. ¶ 6.
[2] *Id*. ¶ 7.

1

connection with that sale, Optiva and iLight entered into an Asset Purchase Agreement (the "APA") whereby a portion of the purchase price for Optiva's Architectural Lighting Division was placed in escrow to cover, among other things, any claims by iLight that Optiva breached representations and warranties contained in the APA.[3]  Additionally, in connection with the APA, Plaintiffs each executed separate Noncompetition, Non-Solicitation, and Confidentiality Agreements[4] dated October 1, 2020, (collectively, the "Non-Competition Agreements").[5]  iLight agreed to make payments to Plaintiffs beginning three years after the sale if Plaintiffs remained in compliance with the Non-Competition Agreements.[6]

Plaintiffs filed this action contending iLight repudiated the Non-Competition Agreements by terminating its payment obligations "without cause."  Plaintiffs sought punitive damages for what they characterize as iLight's intentional conduct asserting false claims of breach.[7]  iLight denied Plaintiffs' allegations and asserted a counterclaim (the "Counterclaim") for declaratory judgment, alleging Plaintiffs breached the Non-Competition Agreements.[8]

---

[3] *Id.*

[4] These Agreements are identical other than the parties and payment amounts. Pls.' Mot. for Partial Summ. J. (hereinafter "Pls.' Mot.") at ¶ 3.

[5] Compl. ¶ 8.

[6] *Id.* ¶ 11.

[7] Pre-trial Stipulation at 2.

[8] *Id.*

## FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise noted, the following facts are not disputed.

### A. Relevant Language of the Non-Competition Agreements

The Non-Competition Agreements, in Section 2(a), prohibit the "Restricted Party" and the "Restricted Party's Affiliates" from competing with iLight during the five-year "Restricted Period."[9] Each of the Plaintiffs is a Restricted Party. Section 3 of the Non-Competition Agreements also precludes Plaintiffs from soliciting former Optiva employees who become iLight employees. Section 3 provides:

> Non-Solicitation. During the Restricted Period, the Restricted Party agrees that it shall not, and shall cause the Restricted Party's Affiliates not to, directly or indirectly, employ, engage, solicit or induce, or attempt to solicit or induce, any employees of [Optiva] who become employees of the Purchaser or any of its Affiliates in connection with the transactions contemplated by this Agreement, to terminate their engagement, representation or other association with [iLight]. The Restricted Party acknowledges that the covenants set forth in this Section 3 are necessary to enable [iLight] to maintain a stable workforce and remain in business.[10]

Section 21(a) of each of the Non-Competition Agreements requires that iLight make specific payments to Plaintiffs (the "Payment Provisions") in consideration of Plaintiffs' restrictive covenants drawn from the Non-Competition Agreements.[11] iLight agreed to make twenty-four monthly payments to each

---

[9] The "Restricted Period" is defined as five years from the closing. Pls.' Mot. ¶ 4.
[10] Pls.' Mot., Ex. 5 (Non-Solicitation Provision).
[11] According to Section 21(a) of each of the Non-Competition Agreements, iLight is required to pay Plaintiffs as follows: (a) Callahan is to receive $120,000, payable in equal monthly

Plaintiff beginning in the first month following the third anniversary of the Non-Competition Agreements.[12] The Payment Provisions also provide a remedy for iLight if Plaintiffs breach the Non-Competition Agreements: the Payment Provisions become null and void, no payment is required by iLight, but Plaintiffs' obligations remain in full force and effect.[13]

**B. The Transition Services Agreement and Transition Work Services**

Edward Chen ("Chen") is an engineer and former employee of Optiva, who became an iLight employee under the APA's terms. As part of the sale proceedings, the parties entered into a Transition Services Agreement (the "TSA") under which some of iLight's new employees, such as Chen, were to provide services (the "Transition Work Services") for Optiva to assist in connection with the transition.[14] For example, iLight expressly authorized Chen "to provide engineering services to [Optiva] which shall include organizing the files and materials of [Optiva]" and to complete other tasks relating to specific products.[15] Chen was to provide up to twenty-hours of transition services to Optiva during each of the first three weeks of

---

installments beginning in October 2023; (b) Newbold and Cleaver are to receive $60,000 each, payable in equal monthly installments beginning in October 2023. Pls.' Mot., Ex. 5.

[12] Countercl. ¶ 7.

[13] Pls.' Mot., Ex. 5.

[14] Pls.' Mot. ¶ 8; Callahan Dep. 29.

[15] Pre-trial Stipulation ¶ 14.

the twelve-week term of the TSA, only through December 24, 2020.[16] But Chen had a forty-hour work week at iLight; every hour, therefore, Chen performed transition services for Optiva was an hour he was prevented from providing services to iLight.[17]

### C. Chen's Communications

Chen began performing his TWS in October 2020.[18] At some point, according to Plaintiffs, Chen became concerned that his TWS would prevent him from completing his iLight assignments on a timely basis.[19] His solution was to perform the TWS for Optiva on his own time and devote 100% of his normal work week to working on projects for iLight.[20] According to Plaintiffs, in late October 2020, Chen approached Callahan with this idea, proposing Chen perform the TSW as an independent contractor, for which he would be paid directly by Optiva.[21] On October 28, 2020, Chen sent an email (the "October 28 Email") to iLight's Vice

---

[16] Pls.' Mot. ¶ 9; Ex. 6, Schedule A. Under the terms of the TSA, Optiva was to pay iLight $75/hour for Chen's transition service work for the first 100 hours of work and $105/hour for any additional work. *Id*.; Pre-trial Stipulation ¶ 15.

[17] Pls.' Mot. ¶ 10; iLight Dep. 37.

[18] Pre-trial Stipulation ¶ 17.

[19] Pls.' Mot. ¶ 14; Chen Aff., ¶ 6.

[20] Pls.' Mot. ¶ 15; Chen. Aff. ¶ 7. Chen ran this idea past Optiva first, and, Plaintiffs contend, if Optiva found it acceptable, Chen indicated he would ask his superiors at iLight. *Id*. ¶ 16; Chen. Aff. ¶ 8.

[21] Pls.' Mot. ¶ 17; Chen Aff., ¶ 9; Callahan Dep. 37. According to Plaintiffs, Callahan responded to Chen's proposal by telling Chen Optiva was indifferent from a practical standpoint, but that the decision was up to iLight. Pls.' Mot. ¶ 18; Chen Aff. ¶ 9; Callahan Dep. 37. Callahan told Chen if iLight approved the proposal, Optiva would want iLight's approval in writing to ensure there was no misunderstanding. Pls.' Mot. ¶ 18; Chen Aff. ¶ 9.

President of Engineering and Operations, Kurt Starkey ("Starkey"), with his request to devote his full forty-hour work week to iLight while working off-hours for Optiva as an independent contractor.[22] Starkey summoned Chen to a meeting (the "October Meeting") a day after receiving the October 28 Email and informed Chen that iLight "would not permit him, as an employee, to perform independent contractor work" for Optiva in addition to his employment duties with iLight.[23] Chen allegedly indicated he understood and accepted iLight's position and left Starkey's office.[24] According to Plaintiffs, Chen considered the matter closed and continued to perform his TWS as an iLight employee.[25]

### D. Chen's Employment Termination

On November 6, 2020, Chen sent Callahan and Newbold an email (the "November 6 Email") whereby Plaintiffs allege Chen was soliciting Optiva for work as an independent contractor.[26] According to Plaintiffs, Newbold responded to the

---

[22] That email reads: "Talking to Sean and Tim at Optiva, they said that if I wanted to, they could add me on as a contractor and I'd work outside of Luminii. I figure that'll open me back up to 40 hr/wk at Luminii, and Luminii won't need to track and bill my hours to Optiva. I'm not completely sure this is what I want to do, I need to weigh all tax and liability issues, but before I do, I wanted to make sure it would be ok with Luminii for me to do that. I don't see any conflicts of interest since there's no product overlap." Pls.' Mot., Ex. 9. Plaintiffs allege if this email is offered to prove iLight's claims of Optiva's breach, it is inadmissible hearsay and speculation. *Id*. at 2. Plaintiffs contend Chen never verbally told any representative of iLight that Optiva or any representative of Optiva approached him to undertake work for Optiva as an independent contractor while still an employee of iLight. *Id*. ¶ 13.

[23] iLight Interrog. Resp., Interrog. 4; iLight Dep. 42.

[24] Pls.' Mot. ¶ 23.

[25] *Id*.

[26] That email reads: "I am thinking about resigning from Luminii in the near future and wanted to check with you guys that I'd still be able to contract with Optiva even after leaving. The work at

6

November 6 Email by encouraging Chen to raise his concerns with the appropriate personnel at iLight.[27] Chen continued to provide his TWS until he left iLight's employment on December 23, 2020.[28] Then, beginning in January 2021, Chen performed work for Optiva as an independent contractor.[29] On April 16, 2021, iLight emailed each Plaintiff a "Notice of Breach of Termination" (the "Breach Notices") which informed Plaintiffs they had breached Section 3 of the Non-Competition Agreements, specifically that Chen "was approached by [Optiva] to undertake work as an independent contractor for [Optiva]."[30] In each letter, Plaintiffs were told "in accordance with Section 21(a) of the [Non-Competition Agreements], [Plaintiffs were] no longer entitled to the Noncompetition Payment and any rights…previously had to the [Non-Competition Agreements] [were]

---

Luminiii has been fine, I've actually been enjoying it more and more (I logged into DBA for the very first time last week and I regret not using it more, it was surprisingly intuitive and fun), but I've become increasingly less comfortable with their Covid response…I didn't sign any kind of non-compete, but just wanted to make sure there wasn't something else in the transition agreement that I may not know. Again, I wanted to thank you both for all of the years I've worked for you, I appreciate that time even more now." Pls.' Mot., Ex. 12.

[27] Pls.' Mot. ¶ 34 ("We encourage you to take your concerns…to the appropriate person at Luminii, if you have not already.") *Id*.

[28] Pls.' Mot. ¶ 29; Callahan Dep. 48. Chen provided a number of reasons for his decision to leave iLight, including salary and health concerns. Pls.' Mot., Ex. 12. Plaintiffs admit in January 2021, after leaving employment at iLight, Chen did a small amount of work for Optiva as an independent contractor. *Id*. ¶ 39. In 2021, Chen performed a total of 33.5 hours of work for Optiva, for which he was paid $3,015. *Id*. ¶ 39; Newbold Aff. ¶ 2; Newbold Dep. 69.

[29] Pre-trial Stipulation ¶ 31. Plaintiffs allege Chen's "small amount of work for Optiva as an independent contractor" essentially finished the transition services under the TSA that had not been completed as of the expiration of that agreement. Pls.' Mot. ¶ 39.

[30] Defendant's Answering Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment (hereinafter "Def.'s Ans. Br.") at 13; DX31; DX32; DX33. Those Breach Notices were identical other than the addressee. Pls.' Mot. ¶ 40; Ex. 15.

terminated."[31]  The Breach Notices were served on Plaintiffs at the same time iLight served Optiva with a notice of claims (the "Claims Notices") under the APA between iLight and Optiva.[32]  Those Claims Notices alleged various breaches of the representations and warranties in the APA and are the subject of a separate arbitration proceeding between the parties.

## E. Filings in this Court

Plaintiffs filed this action in this Court on August 27, 2021.[33]  In response, iLight filed a Counterclaim alleging its own breach of contract claim and seeking a declaratory judgment confirming (a) Section 21 of each Non-Competition Agreement is null and void; (b) iLight has no obligation to make any Noncompetition Payments to Plaintiffs; (c) Plaintiffs have no rights under Section 21 of the Non-Competition Agreements; and (d) the remainder of the Non-Competition Agreements, including but not limited to Plaintiffs' restrictive covenants remain in full force and effect in accordance with their terms.[34]  On January 14, 2022, iLight filed its motion for partial judgment on the pleadings as to

---

[31] Def.'s Answ. Br. at 13; DX31, DX 32; DX 33.

[32] Pls.' Mot. ¶ 41. The notice of claims included a claim related to alleged price increases by Sheldahl Flexible Technologies, Inc. (the "Sheldahl Claim"). *Id*. The Sheldahl Claim was discussed around the same time Starkey asked for documents related to Chen's employment. *Id*. ¶ 42. On January 18, 2021, Starkey emailed Chen's resignation letters to participants which included David Jacob, who signed the Breach Notices on behalf of iLight. *Id*., Ex. 18.

[33] *See* Compl.

[34] Countercl. ¶ 22.

8

Count Three of Plaintiffs' Complaint (the "Pleadings Motion").[35] Count Three of Plaintiffs' Complaint asserts a claim for punitive damages.[36] On March 1, 2022, the Court held argument on iLight's Pleadings Motion. At the argument's conclusion, the Court granted iLight's motion, dismissing Count Three of the Complaint while granting Plaintiffs leave to file an amended complaint.[37] On March 21, 2022, Plaintiffs filed a First Amended Complaint (the "Amended Complaint").[38] On March 10, 2022, Plaintiffs filed their motion for partial summary judgment (the "Summary Judgment Motion"), arguing the "undisputed evidence conclusively demonstrates that Plaintiffs did not violate" the Non-Solicitation Provision.[39] On April 4, 2022, iLight renewed its Pleadings Motion as to Count Three of Plaintiff's Amended Complaint.[40]

### F. Parties' Contentions

Plaintiffs contend at no time while Chen was employed by iLight did Callahan, Newbold, Cleaver, or any other employee or representative of Optiva, directly or indirectly employ, engage, solicit or induce, or attempt to solicit or induce

---

[35] D.I. 17.

[36] *See* Compl. ¶ 34. ("iLight's repudiation and total breach of the Noncompetition Agreements was malicious, without probably cause, and was made for the purpose of injuring Plaintiffs and depriving them of the benefits of the Noncompetition Agreements. In repudiating the Noncompetition Agreements, iLight has made intentional misrepresentations of material facts and has otherwise engaged in conduct akin to an intentional tort.") *Id.*

[37] *See* D.I. 33.

[38] *See* D.I. 38.

[39] D.I. 35; Pls' Mot. at 18.

[40] D.I. 40; Letter to The Hon. Abigail M. LeGrow re: Defendant's Renewed Mot. for Partial J. on the Pleadings at 2.

Chen to terminate his employment or other relationship with iLight.[41] Plaintiffs allege Newbold and Callahan refused to engage in any conversation about the possibility of Chen performing services for Optiva as an independent contractor *until* Chen no longer was employed by iLight, and instead encouraged Chen to resolve his issues directly with iLight.[42] Plaintiffs argue Chen never told any iLight representative that Optiva or any Optiva representative approached him to undertake work for Optiva as an independent contractor while he was an iLight employee.[43] Plaintiffs contend iLight began engaging in discussions regarding whether Plaintiffs or any Optiva representative had solicited Chen only when iLight started preparing its claims against the escrowed purchase price for alleged breaches of the APA.[44] Plaintiffs also contend iLight manufactured claims that Plaintiffs breached the Non-Competition Agreements to create leverage in the parties' dispute regarding the escrowed purchase price, and iLight's conduct was egregious enough to support a punitive damages claim.[45]

iLight disputes these claims. iLight contends Plaintiffs breached the Non-Competition Agreements by soliciting Chen in October 2020 to provide services to

---

[41] Pls.' Mot. ¶ 12. If anything, the Plaintiffs argue the only evidence in the record of any solicitation is not solicitation of Chen, but by him. *Id*. at 3.

[42] Pls.' Mot. at 3.

[43] Pls.' Mot. ¶ 13; Chen. Aff. ¶ 12.

[44] Pls.' Mot. ¶ 27.

[45] *See* Compl. Count III.

Optiva as an independent contractor.[46]  According to iLight, Optiva actively sought to engage and employ Chen.[47]  Following the solicitation, Chen resigned from his position as an engineer with iLight.[48]  After Chen resigned from iLight and began working at Optiva, iLight alleges it notified each Plaintiff that, by breaching the Non-Competition Agreements, they forfeited their rights under the Payment Provisions.  iLight also contends Plaintiffs' claims as alleged in their Complaint are nothing more than breach of contract claims and, other than a few narrow exceptions, Delaware law does not award punitive damages for breach of contract.[49]  iLight argues the Amended Complaint is devoid of allegations that iLight engaged in the type of egregious conduct required to meet the exceptions to this rule.[50]

This letter opinion resolves both the Pleadings Motion and the Summary Judgment Motion. Given the proximity to trial and the fact that this case will be heard as a bench trial, the Court declines to resolve either the breach of contract claim or the punitive damages claim on a paper record.  Rather, there are sufficient factual and credibility issues to necessitate a trial.

---

[46] Pls.' Mot. ¶ 11; *See* Countercl.
[47] Def.'s Mot. at 2.
[48] Countercl. ¶ 13.
[49] Def.'s Mot. for Partial J. on the Pleadings as to Count Three of Pls.' Compl. (hereinafter "Def.'s Mot.") at 3.
[50] *Id*. at 2.

11

## I. iLight's Pleadings Motion is denied because Plaintiffs allege facts to support a reasonably conceivable claim for punitive damages.

Under this Court's Civil Rule 12(c), any party may move for judgment on the pleadings after the pleadings are closed but within a reasonable time so as not to delay trial.[51] Upon such a motion, the Court must accept all the complaint's well-pled facts as true and construe all reasonable inferences in favor of the non-moving party.[52] The standard regarding a motion for judgment on the pleadings is "almost identical" to the standard for a motion to dismiss; such a motion will be granted (i) when no material issues of fact exist, and (ii) the moving party is entitled to judgment as a matter of law.[53]

The purpose of punitive damages is punishment and deterrence.[54] Under Delaware law, punitive damages generally are not awarded in breach of contract cases even when the breach resulted from an intentional refusal to perform.[55] Although not customary, the Delaware Supreme Court has held punitive damages may be recoverable in certain breach of contract cases where a defendant's conduct

---

[51] *See* Del. Super. Ct. Civ. R. 12(c).
[52] *Id.* (quoting *Blanco v. AMVAC Chem. Corp.*, 2012 WL 3194412, at * 6 (Del. Super. Aug. 8, 2012)).
[53]*Id.*; *Velocity Exp., Inc. v. Office Depot, Inc.*, 2009 WL 406807, at *3 (Del. Super. Feb. 4, 2009) ("When the question is whether to dismiss a claim in the context of a motion for judgment on the pleadings, the inquiry follows the procedures established by Rule 12(b)(6) jurisprudence.").
[54] *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 599, n.7 (Del. Super. 1987).
[55] *Standard Distrib. Co. v. NKS Distrib., Inc.,* 1996 WL 944898, at *12 (Del. Super. Jan. 3, 1996).

"exhibits a wanton or willful disregard for the rights of [the] plaintiff."[56] In *Casson v Nationwide Insurance Co.*,[57] this Court held "given the proper set of circumstances," punitive damages may be appropriate in "egregious cases of willful and malicious breach of contract."[58] In such cases, to recover punitive damages, the plaintiff "must show that the defendant acted maliciously and without probably cause for the purpose of injuring the other party by depriving him of the benefits of the contract."[59] But if the conduct "does not rise to the level of an intentional tort," or if there is a "*bona fide* belief" in a meritorious defense, punitive damages should not be awarded.[60]

The facts alleged in Plaintiffs' Amended Complaint adequately could support a claim that iLight breached the Non-Competition Agreements. Plaintiffs' Amended Complaint further avers iLight's actions were intended to harm Plaintiffs in order to gain leverage in the parties' unrelated dispute regarding the APA. In the Amended Complaint, Plaintiffs allege iLight's intentional act of sending the Breach Notices, which relied upon allegations iLight knew to be false, supports the contention that

---

[56] *Ripsom v. Beaver Blacktop, Inc.*, 1988 WL 32071, at *16 (Del. Super. Apr. 6, 1988) (citing *Cloroben Chem. Corp v. Comegys*, 464 A.2d 887 (Del. Super. 1983)).
[57] 455 A.2d 361 (Del. Super. 1982)
[58] *Id*. at 368 (citing *McClain v. Faraone*, 369 A.2d 1090 (Del. Super. 1977)).
[59] *Ripsom*, at *18 (Del. Super. Apr. 6, 1988).
[60] *Id*. ("[T]his Court has phrased the test for punitive damages in breach of contract cases in various ways….[t]he import of these cases suggests that punitive damages may not be awarded for breach of contract unless 'the intentional breach is similar in character to an intentional tort.'" (internal citations omitted)). *Id*. at *16

iLight acted with malicious intent, without probable cause, and with the purpose of injuring Plaintiffs.[61] Plaintiffs allege iLight used the Breach Notices as bargaining chips during the negotiations regarding Optiva's alleged breach of the APA.[62] Specifically, Plaintiffs contend iLight delivered their Breach and Claims Notices together as part of a "malicious scheme to negotiate a claw-back of a portion of the purchase price paid under the Purchase Agreement."[63] Such an allegation allows a reasonable inference to be drawn that iLight intentionally misrepresented the cause for terminating the Non-Competition Agreements when delivering the notices to the Plaintiffs.

iLight's alleged knowledge of the factual misrepresentations contained in the Breach Notices, if proven, negates any meritorious defense iLight could raise, including Chen's October 28 Email. At most, the October 28 Email, which iLight uses to support its Counterclaim, provides evidence Plaintiffs were soliciting an employee to work as an independent contractor *outside* his proscribed work hours. All these facts, taken together as a whole, could support a claim that iLight created a frivolous breach claim to create leverage and erase some or all of iLight's obligations to pay the remaining asset purchase price under the APA.

---

[61] Compl. ¶ 34. Plaintiffs contend the act of sending those documents with the knowledge that they contained intentional misrepresentations of material facts was "akin to an intentional tort." *Id*. ¶ 18.
[62] *Id*.
[63] *Id*.

The inference that iLight acted willfully and maliciously and intended to injure Plaintiffs also may be drawn from the nature of the Non-Competition Agreements and the unusual timing of the Breach Notices. Although the resolution of the dispute involving the APA and escrowed purchase price would have a proportional effect on all Optiva's selling shareholders, the Breach Notices relating to the Non-Competition Agreements had a disproportionate effect on the Plaintiffs, in that Callahan, Newbold, and Cleaver alone were entitled to payments under those agreements. It also is significant that the breach notices were sent to Plaintiffs years before iLight had an obligation to make payments under the Non-Competition Agreements; these notices do, however, coincide with the arbitration dispute.

Plaintiffs' punitive damages claim survives for now, though this may be a short-lived victory. Recovery under a punitive damages theory in the breach of contract context is unlikely given the high standard Plaintiffs must meet during trial to support this claim. But the facts alleged in the Amended Complaint are enough to sustain Count Three under Rule 12. iLight's Pleadings Motion therefore is **DENIED.**

### II. Plaintiffs' Summary Judgment Motion is denied because factual issues concerning Plaintiffs' alleged breach require resolution at trial.

A motion for summary judgment is appropriate "only when the record shows there is no genuine issue of material fact and the moving party is entitled to judgment

15

as a matter of law."[64] The moving party has the burden of proof.[65] If that burden is met, the non-moving party must establish the existence of one or more genuine issues of material fact.[66] To determine whether material facts are in dispute, the Court construes the record in the light most favorable to the non-movant.[67]

## A. Plaintiffs did not breach the Non-Competition Agreements by hiring Chen after he left his employment with iLight.

In its response to Plaintiffs' Summary Judgment Motion, iLight presented a new contractual interpretation theory that was not contained in the Breach Notices, the Counterclaim, or iLight's discovery responses. According to iLight, the Non-Competition Agreement's "non-solicitation covenant" is broader than what Plaintiffs contend or what the term "non-solicitation" suggests.[68] Specifically, iLight now argues Plaintiffs agreed to a clause that prohibits not just soliciting or inducing former Optiva employees to terminate their engagement with iLight, but also prohibits Plaintiffs from "employ[ing] [or] engag[ing]" any former iLight employee for a period of five years, regardless of how or why that person left

---

[64] *LaPoint v. AmerisourceBergen Corp.*, 979 A.2d, 185, 191 (Del. 2009) (citing *Williams v. Geier*, 671 A.2d 1368, 1375 (Del. 1996) (citing *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270, 1276 (Del. 1994))).

[65] *Heasley v. Allstate Prop. and Casualty Ins. Co.*, 2022 WL 951261, at * 2 (Del. Super. Mar. 28, 2022). *See also* Super. Ct. Civ. R. 56.

[66] *Heasley*, at *2 (Del. Super. Mar. 28, 2022) (citing *Quality Elect. Co., Inc., v. E. States Const. Serv., Inc.*, 1995 WL 379125, at *3-4 (Del. 1995)).

[67] *Judah v. Del. Tr. Co.,* 378 A.2d 624, 632 (Del. 1977).

[68] Def.'s Answ. Br. at 19.

iLight's employ.[69]  Under this new theory, because Plaintiffs hired Chen after he left his employment with iLight, Plaintiffs breached the Non-Competition Agreements. iLight theorizes that, even without evidence of solicitation, the mere fact Plaintiffs employed Chen means iLight properly served its Breach Notices.

A strong argument could be made that iLight waived this argument by failing to identify it as a basis for breach in any manner before iLight responded to the Summary Judgment Motion.  But even if the argument was not waived, iLight's theory is not a reasonable interpretation of the Non-Competition Agreement's plain language and is inconsistent with those agreements' purpose.

This Court interprets clear and unambiguous terms found in a contract according to their ordinary meaning.[70]  The terms of a contract will be controlling "when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[71]  When interpreting a contract, this Court's role is to effectuate the parties' intent according to "the parties' words and the plain meaning of those words where no special meaning is intended."[72]  A mere disagreement between two parties

---

[69] *Id*. at 19-20.

[70] *GMG Capital Inv., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (citations omitted).

[71] *Id*. (*quoting Eagle Indus., Inc., v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[72] *Lorillard Tobacco Co., v. American Legacy Foundation*, 903 A.2d 728, 739 (Del. 2006).

upon a contract's proper construction does not render a contract ambiguous.[73] Ambiguity only exists "[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings."[74]

Section 3 of the Non-Competition Agreements cannot reasonably be interpreted as iLight suggests. Contrary to iLight's position, Delaware courts construe restrictive covenants narrowly as written.[75] iLight offers no explanation as to why the phrase "to terminate" only modifies some of the verbs in Section 3 but not others. In the Court's view, reading the phrase "to terminate" as the object of all verbs is consistent with the clauses' punctuation and structure and accords the clause a narrow reading consistent with Delaware's approach to such covenants.

iLight's interpretation also would impose a five-year hiring freeze on numerous workers while serving no purpose in furthering iLight's growth or success. Under Delaware law, this Court will not enforce a restrictive covenant "that is more restrictive than an employer's legitimate interests justify or that is oppressive to an employee."[76] A restrictive covenant covering a limited geographic area "for two or

---

[73] *Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co*., 616 A.2d 1192, 1195 (Del. 1992).

[74] *Eagle Indus., Inc., v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del. 1997).

[75] *Concord Steel, Inc. v. Wilmington Steel Processing Co., Inc*., 2008 WL 902406, at *6 (Del. Ch. Apr. 3, 2008)(citing *Allied Capital Corp., v. GC-Sun Holdings, L.P.,* 910 A.2d 1020, 1024 (Del. Ch. 2006)).

[76] *Elite Cleaning Co., Inc. v. Capel*, 2006 WL 1565161, at *8 (Del. Ch. June 2, 2006) (quoting *RHIS, Inc. v. Boyce*, 2001 WL 1192203, at *6-7 (Del. Ch. Sept. 26, 2001) (internal citations omitted))).

fewer years generally [has] been found [to be] reasonable."[77]  The reasonableness, however, of a five-year restrictive covenant would be a challenge to defend.

And iLight's own cases do not support its position.  For example, in *ProTherapy Associates, LLC v. AFS of Bastian, Inc.,*[78] which iLight cites in support of its argument that breach of a restrictive covenant against hiring or contracting with employees did not require proof of active solicitation, involved a clause that broke "solicitation" and "employment" into two distinct subparts, a plain reading of which demonstrate a clear intention by the parties to prohibit both solicitation and employment during the term of the restrictive covenant.

No such language exists here.  The non-solicitation clause's purpose, as expressly provided in the Non-Competition Agreements' Section 3, is to provide iLight a stable workforce after the closing of the APA.  Prohibiting Plaintiffs from hiring former iLight employees does not achieve that purpose, since doing so after those employees leave iLight would have no discernible effect on iLight's workforce.  Further, additional, separate non-compete covenants existed in connection with the APA to address any competitive concerns iLight might have had regarding Optiva hiring former iLight employees.

---

[77] *Id.* (citing *Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170, at *2 n.5 (Del. Ch. Apr. 19, 2005)).
[78] 782 F. Supp. 2d 206 (W.D. Va. 2011).

To summarize, the non-solicitation clause's plain language controls the Court's ruling. That ruling finds no merit in iLight's position that employing or engaging Chen after termination of his employment with iLight constituted a breach of contract absent proof Plaintiffs solicited that termination.

### B. Disputed issues of fact exist concerning whether Plaintiffs breached the Non-Competition Agreements.

iLight's failed contractual interpretation theory is not enough to enter summary judgment in Plaintiffs' favor. To enter judgment as a matter of law, the Court must find for Plaintiffs after concluding there are no material factual disputes and after drawing all reasonable inferences in favor of iLight. Here, material factual disputes exist concerning Chen's communications with the parties which cannot be resolved on a paper record. For example, although Chen in his affidavit disclaims any solicitation occurred, he was not deposed during discovery, and the language in his affidavit is nearly identical to the language found in the Non-Competition Agreements.[79] Moreover, a mere eight days after meeting with Starkey and being denied the opportunity to work as an independent contractor for Optiva, Chen sent an e-mail informing Plaintiffs he was "thinking about resigning from [iLight] in the near future" and asking if he could "contract with Optivia . . . after leaving."[80]

---

[79] "At no time while I was employed by iLight did Mr. Callahan, Tim Newbold, Mark Cleaver, or any other employee or representative of Optiva, dire[ct] or indirectly employ, engage, solicit or induce, or attempt to solicit or induce me to perform any service for Optiva or to terminate my employment or other relationship with iLight." Def.'s Answ. Br. ¶¶ 6-9; DX35.

[80] Def.'s Answ. Br. at 9; DX18.

20

iLight's argument that Chen was incentivized to assist Plaintiffs in this case because he depended on Plaintiffs in April of 2021 as references for a new job is plausible.[81]

In sum, given the timing and proximity of Chen's departure from iLight and the communications between Plaintiffs and Chen, it is better to resolve Plaintiffs' breach of contract claim in the more highly textured setting of trial, especially since Plaintiffs' punitive damages claim survived dismissal. The punitive damages claim will require the parties to effectively present their entire breach of contract claim at trial, irrespective of the Court's ruling on the Summary Judgment Motion.[82] Overall, the evidence before the Court, viewed in the light most favorable to iLight, raises questions concerning whether and to what extent Plaintiffs' communications with Chen rose to the level of solicitation. Additionally, evidentiary issues exist regarding the admissibility of certain documents to support the positions *both* parties wish to take, particularly concerning Chen's involvement. Those evidentiary issues will not be resolved until trial. For all those reasons, Plaintiffs' Summary Judgment Motion is **DENIED**.

---

[81] Def.'s Answ. Br. at 15.

[82] The Court is also aware the record supports the notion Chen uses personal devices to communicate with Plaintiffs. *Id*. at 21; DX10; DX22.

## CONCLUSION

For the reasons articulated above, both iLight's Pleadings Motion and the Plaintiffs' Summary Judgment Motion are **DENIED.**

**IT IS SO ORDERED.**

Yours very truly,

*/s/ Abigail M. LeGrow*

Abigail M. LeGrow, Judge